## LOCAL 379 OF INTERNATIONAL UNION UNITED AUTO. AIRCRAFT AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, C.I.O., v. JACOBS MFG. CO.

### Civ. A. No. 3893.

United States District Court
D. Connecticut.

April 16, 1953.

Nathan Aaron, Hartford, Conn., Harold B. Roitman, Boston, Mass., for plaintiff.

Walfrid G. Lundborg (of Shipman & Goodwin), Hartford, Conn., for defendant.

SMITH, District Judge.

The issue in this case, as stated by the Court in the pre-trial order of March 2, is as follows:

"Whether the company's refusal to provide employment at lighter work than his former work for Valentino Celani, who has been unable to perform tasks formerly performed by him as an employee of the defendant following a coronary attack, is arbitrable under the employment contract between plaintiff and defendant as a discharge or suspension of Celani."

### Finding of Facts

1. This action arises under the provisions of the Labor Management Relations Act 1947, Title III, Section 301, Public Law 101, 80th Congress, 29 U.S. C.A. § 185, under which this Court has jurisdiction without respect to the amount in controversy or diversity of citizenship.

2. The plaintiff, Local 379 International Union United Automobile, Aircraft and Agricultural Implement Workers of America, C. I. O., is a voluntary unincorporated association including in its membership employees of the defendant Jacobs Manufacturing Company. The plaintiff, Local Union, is a part of

the International Union United Automobile, Aircraft and Agricultural Implement Workers of America, C. I. O., popularly called the United Auto Workers with headquarters in Detroit, Michigan. Mr. Stig Lindholtz is President of Local 379, which is a labor organization as defined in Section 2(5) of the Labor Management Relations Act.

3. The defendant, Jacobs Manufacturing Company, is a corporation duly organized under the laws of the State of Connecticut with its principal place of business in West Hartford, Connecticut. The defendant is engaged in activities affecting commerce within the meaning of Section 2(7) of the Labor Management Relations Act.

4. On July 27, 1950, the plaintiff union and the defendant company entered into a Collective Bargaining Agreement. This Agreement is still in full force and effect.

5. Celani, an employee of defendant, suffered a coronary attack on November 18, 1951, which incapacitated him.

6. He was examined by his own doctor, and later by the company doctor on March 3, 1952; he was then and is now unable to return to his old job.

7. On March 25, the Union filed a grievance under Art. XIII [see infra] of the contract, claiming "the discharge of V. Celani was without reasonable cause * * *". The company refused to recognize this as a grievance on grounds Celani hadn't been discharged.

8. On March 31 and on April 7, the Union repeated its request that the grievance be acted upon; the answer was the same.

9. On May 21, the company offered Celani the choice of remaining on as an inactive employee on a medical leave of absence until November 16, 1952, or terminating his employment for ill-health. The same letter stated also: "We would like to point out that the possibility of improvement in a case such as yours is unlikely."

10. On May 26, the Union submitted the same grievance upon grounds that a company man told Celani's daughter on May 25 that he was discharged.

11. On June 5, the company, having received no response from Celani to its letter of May 21, notified Celani it had decided " * * * to continue you as an inactive employee on a medical leave of absence for an indefinite period. Should you decide to select either one of the proposals we submitted at any time, they are available to you."

12. On June 6, the Union again filed the same grievance; the company's answer was the same as previous answers: "V. Celani has not been discharged."

13. On June 12, the Union renewed its contention, requested a meeting, and in addition requested arbitration on the matter "if the Co. maintains its present position and we are naming . Merlin Bishop as our Rep. on the panel."

14. The applicable provisions of the contract are as follows:

"*Article V. Grievance Procedure*

"Section 1. Should a difference arise between the Company and any employee concerning the meaning, interpretation or application of any provision of this agreement with reference to his rate of pay, wages, hours of employment and conditions of employment, an earnest effort shall be made to settle such difference according to the following sequence and procedure which must be followed: * * *." [The procedure involves taking the dispute first to the foreman, then to the Personnel Manager, and then to the Factory Manager.]

"*Article XII. Arbitration*

"Section 1. In the event there arises a dispute or difference of opinion between the Company and any employee or group of employees as to the meaning and interpretation of any provision hereof, or the discharge or suspension of an employee, which dispute or difference arose during the processing of a grievance under the grievance procedure, either party may request

that the question of interpretation on which such difference of opinion exists be referred to arbitration in accordance with the following procedure: * * *." [The Company and the Union each select a representative; the two representatives then choose a third who acts as chairman for the panel.]

"Sec. 2. Decisions in arbitration shall be confined to a determination of the meaning and interpretation of the provisions of the contract which gave rise to the dispute. Decisions in arbitration shall be binding upon both parties. Expenses of arbitration shall be borne equally by the Company and the Union.

"Sec. 3. No question relating to the functions reserved for the Company or the scope of the bargaining unit shall be submitted to arbitration. There shall be no power to add to, subtract from or modify this agreement or to establish or change any rates of pay or wages."

"*Article XIII. Discharge*

"Section 1. Any employee shall have the right to appeal his discharge or suspension through the grievance procedure within five days after such discharge or suspension becomes effective. Such employee shall have the privilege, after discharge or suspension, of seeing the chairman of the Shop Committee, if he so desires, before leaving the plant. If, as the result of such an appeal, an employee is found to have been discharged or suspended without reasonable cause he shall receive full pay for the time he would have otherwise normally worked."

"*Article XV. Vacancies*

"Section 1. When a new job or vacancy occurs in a labor grade the employee in any lower grade having the highest plant-wide seniority who is qualified to meet the standards of performance consistent with the proper ability to do the services required, and makes application for such job, shall be given preference in filling such new job or vacancy.

"Sec. 2. When a new job or vacancy occurs in any labor grade the Company agrees to post a notice of such new job or vacancy on the Company bulletin board for a period of not less than twenty-six hours, except that the Company may hire or transfer employees to the following departments: toolroom, screw machine, maintenance, molding, plating, rubber mill and heat treat.

"Sec. 3. Progressions of Employees in labor grades 11 through 7 on jobs producing on standards and in labor grades 11 through 9 not on standards shall be on the basis of seniority and ability, except that seniority shall be the deciding factor. Progressions of employees in labor grades 8 through 3 on jobs not on standards shall be on the basis of ability, consideration being given, however, to seniority, except that ability shall be the decisive factor and the judgment of the Company shall be final. Degressions shall, accordingly, be in the reverse order. The provisions of this section shall not be considered as exceptions or limitations upon any other provision in this agreement.

"Sec. 4. When an employee is transferred to a new job, if the production performance of such employee as outlined in Article IX is deemed unsatisfactory, such employee shall be returned to a job in the previous labor grade in which he had been employed prior to the transfer at his former rate of pay, without loss of seniority."

Conclusions of Law

1. The Court has jurisdiction of the parties and subject matter of the action.

2. The collective bargaining agreement between the plaintiff and defendant company contemplates arbitration of the dispute as to interpretation of the scope of the agreement as requiring or not requiring arbitration of the dis-

pute between plaintiff and defendant about the duty of defendant to offer Celani employment at lighter work than that done by him before his illness.

3. Plaintiff is entitled to judgment requiring resort by the parties to arbitration as above.

### Discussion

It seems clear at the outset that the Court need not determine the merits of the dispute between Celani and the company. Thus there appears no need to evaluate the allegations in regard to Celani's fitness for existing openings. Nor is it necessary to decide whether the company was obligated to re-employ him in such an opening if he were fit. The sole question is whether the contract requires the company to submit this dispute to arbitration.

Consideration of this question, however, involves first passing on the question of the arbitration panel's jurisdiction to decide jurisdiction. That is to say, should the case go to the arbitration panel for them to decide whether they have jurisdiction over the dispute? If the Court's decision on this question is in the affirmative, then the Court need not consider the merits of the jurisdictional question [the question of the arbitration panel's jurisdiction over this particular dispute].

Resolution of the "jurisdiction-to-decide-jurisdiction" question must depend upon the provisions of the contract. Colt's Industrial Union v. Colt's Mfg. Co., 1950, 137 Conn. 305, 77 A.2d 301. The Colt's case involved a contract which provided for the submission to arbitration of any dispute arising from a difference " 'as to the application of the terms' " of the agreement. The Court said, 137 Conn. at page 307, 77 A.2d at page 302:

"The plaintiff contends that the agreement to arbitrate differences as to the 'application' of the terms of the agreement includes arbitration of differences as to 'interpretation,' and that the parties agreed thereby to submit to arbitration the

question whether any term of the agreement has application to a dispute. The contention is untenable. It is not uncommon for parties to arbitration agreements to confide to arbitrators the decision of legal as well as factual disputes. When this occurs, arbitrators have authority to interpret the agreement. Liggett v. Torrington Building Co., 114 Conn. 425, 430, 158 A. 917; Application of Westinghouse Air Brake Co., 166 Pa.Super. 91, 70 A.2d 681. When, however, the agreement does not so provide, its interpretation is a function of the court. * * * Here the parties have limited arbitration to differences as to the 'application' of the terms of the agreement, and they are bound by the limits they have themselves fixed. * * * The legal question was whether the dispute involved the application of any provision of the agreement. The court was not in error in accepting the responsibility of answering it. * * * "

The contract in question provides for submission to arbitration of the legal question of the meaning of the term "discharge" in the contract; the panel's resolution of this question will determine whether they have jurisdiction over the merits of the dispute.

Certainly the Union's claim that company action in this case constitutes a "discharge" of Celani cannot be called frivolous; hence the Court need not consider whether the Union would be entitled to arbitration of the dispute in such case. Granted a nonfrivolous claim that the company actions amount to a "discharge", then Article XII calls for submission of the dispute over interpretation of the contract to arbitration.

Nor can it be persuasively argued that the dispute did not arise "during the processing of a grievance under the grievance procedure." It is true that the procedure provided by Article V had never actually gone into operation. The Union, however, had done everything within its power to put the mechanism

for adjusting grievances into motion, and it would be unfair in the extreme to allow the company to negate the provisions of Article XII of the contract by its own wilful failure to comply with Article V.

The company should be required to submit to arbitration the interpretation of the terms of the contract in Celani's case.

Judgment will be entered in favor of the plaintiff, requiring submission to arbitration. Form of judgment may be submitted on notice.