**LOCAL 205, UNITED ELECTRICAL, RADIO AND MACHINE WORKERS OF AMERICA (UE), Plaintiff, Appellant,**

v.

**GENERAL ELECTRIC COMPANY (Telechron Department, Ashland, Massachusetts), Defendant, Appellee.**

**No. 4980.**

United States Court of Appeals
First Circuit.

Heard Oct. 6, 1955.

Decided April 25, 1956.

88

Allan R. Rosenberg, Boston, Mass., for appellant.

Warren F. Farr, Boston, Mass., with whom William J. Barron, New York City, Francis J. Vaas, Lane McGovern and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This case, together with two others also decided today, Newspaper Guild of Boston v. Boston Herald-Traveler Corp., 1 Cir., 233 F.2d 102; Goodall-Sanford, Inc., v. United Textile Workers of America, 1 Cir., 233 F.2d 104, presents the question of whether a federal district court has authority, under § 301 of the Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185, to compel an employer to arbitrate a dis-

pute in accordance with the terms of a collective bargaining agreement between such "employer and a labor organization representing employees in an industry affecting commerce".

Plaintiff-appellant is an unincorporated labor organization representing employees of defendant Company at a plant in Ashland, Mass., which is, without dispute, in an industry affecting commerce, within the meaning of the Act. Article XII of the collective bargaining agreement in effect between the parties at the relevant dates established a conventional four-step procedure for adjustment of employee grievances between the Union and the Company, by which negotiation was to continue at progressively higher levels if an agreement was not reached. Article XIII provided:

> "1. Any matter involving the application or interpretation of any provisions of this Agreement which shall not include a matter involving establishing of wage rates, general increases or production standards may be submitted to arbitration by either the Union or the Company. * * *"

The Article required written notice of intention to submit an unresolved grievance to arbitration within 30 days after the decision rendered in step 4 of the grievance procedure, and it went on to describe certain procedural matters and restrictions on the scope of the arbitrator's authority. He was limited, in so far as relevant here, to "interpretation, application, or determining compliance with the provisions of this Agreement but he shall have no authority to add to, detract from, or in any way alter the provisions of this Agreement."

▮ Two grievances filed by the Union in 1954 are the subject of its present suit. One involved a dispute over whether an employee named Boiardi was employed in a certain job classification carrying a higher rate of pay than he in fact was receiving; the other involved the propriety of the discharge of an employee named Armstrong for refusing to clean certain machines when he asserted that such work was in addition to his regular duties. After unsuccessfully prosecuting these matters through the procedure of Art. XII, the Union duly notified the Company in each case of its desire to arbitrate, but the Company refused to submit to arbitration either the merits of the two grievances or the disputed issue of whether they were arbitrable under the provisions of Art. XIII first quoted above. The Union then filed its complaint in the district court, alleging jurisdiction under § 301. It sought as to each of the grievance cases an order "that defendant be required specifically to perform its agreement to arbitrate" and damages. After the district court granted a motion to strike the claims for equitable relief, the amended complaint was again amended to eliminate the damage claims. This was done so that no question could be raised as to the appealability of the decision. Plaintiff's appeal is properly here, under 28 U.S.C. § 1291, from the final order of April 27, 1955, which dismissed the complaint for want of jurisdiction, the district judge being of the view that he was forbidden by the Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq., from issuing the requested order to compel arbitration of the two disputes. See 129 F.Supp. 665.

## I.

▮ In any case where equitable relief in some form is sought in the context of a controversy involving labor relations, a federal court must inquire whether the Norris-LaGuardia Act has withdrawn the jurisdiction of the district court to grant the desired remedy. See W. L. Mead, Inc., v. International Brotherhood of Teamsters, 1 Cir., 1954, 217 F.2d 6, in which case we affirmed an order denying a temporary injunction against a strike and picketing alleged to be in breach of a collective bargaining agreement. We held that § 301 had not repealed by implication the withdrawal of jurisdiction to enjoin the activities listed in § 4 of the Norris-LaGuardia

Act even in a case where such activities constitute a breach of contract. The present case presents a different problem, for the activity against which relief is sought, refusal to arbitrate, can in no way be fitted into any of the classes enumerated in § 4. However, consideration must also be given to § 7 of the Norris-LaGuardia Act, the relevant parts of which are set forth in the footnote.[1] See also §§ 8 and 9. If it is not implicit in our discussion in the Mead case, supra, we now affirm that our determination there that enactment of § 301 did not by implication repeal § 4 of the Norris-LaGuardia Act applies as well to § 7 and indeed to the whole of that Act. It is in this light that one must read the dictum in the Mead opinion, 217 F.2d at page 9, that "equitable relief may sometimes be given in terms which do not trench upon the interdictions of § 4 of the Norris-LaGuardia Act." That is, any such equitable relief to be given in a suit brought under § 301 must also not "trench upon the interdictions of" § 7, when that section and the Act of which it is a part are applicable according to their own terms.

In recognition of this situation, it has sometimes been argued that a suit to remedy a breach of contract does not involve or grow out of a "labor dispute." This argument cannot be accepted, in the face of the sweeping definitions of § 13, which set the scope of the Norris-LaGuardia Act. 47 Stat. 73. Any controversy between an employer and a union "concerning terms or conditions of employment" is included, "and no less so

1. "Sec. 7. No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as herein defined, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

"Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or committed charged with the duty to protect complainant's property: *Provided, however*, That if a complainant shall also allege that, unless a temporary restraining order shall be issued without notice, a substantial and irreparable injury to complainant's property will be unavoidable, such a temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. Such a temporary restraining order shall be effective for no longer than five days and shall become void at the expiration of said five days. No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court. * * *" 47 Stat. 71–72.

because the dispute is one that may be resolved or determined on its merits by reference to the terms of a collective bargaining agreement." W. L. Mead, Inc., v. International Brotherhood of Teamsters, supra, 217 F.2d at page 8, and cases cited; see Note, 37 Va.L.Rev. 739, 746 (1951).

 Nevertheless, it is our conclusion that jurisdiction to compel arbitration is not withdrawn by the Norris-La-Guardia Act. Although the present controversy is a "labor dispute" within the scope of the Act as defined in § 13, the relief sought is not the "temporary or permanent injunction" against whose issuance the formidable barriers of § 7 are raised. Of course, the label used to describe the judicial command is not controlling. We would not rest by saying that an order to arbitrate is a "decree for specific performance" in contradistinction to a "mandatory injunction," for each term has been attached so frequently to this type of relief that neither can be rejected out of hand as an inappropriate characterization of it. But see 2 Pomeroy, Equitable Remedies § 2057 (2d ed. 1919). For reasons to be developed below, we believe that the "injunction" at which § 7 was aimed is the traditional "labor injunction," typically an order which prohibits or restricts unilateral coercive conduct of either party to a labor dispute. E. g., Alcoa S. S. Co., Inc., v. McMahon, D.C.S.D.N.Y. 1948, 81 F.Supp. 541, affirmed 2 Cir., 1949, 173 F.2d 567; Associated Telephone Co. v. Communication Workers, D.C.S.D.Cal.1953, 114 F.Supp. 334. An order to compel arbitration of an existing dispute, or to stay a pending lawsuit over the dispute so that arbitration may be had, as redress for one party's breach of a prior agreement to submit such disputes to arbitration, seems to have a different character, whatever name is given to it. Cf. Sanford v. Boston Edison Co., 1944, 316 Mass. 631, 56 N.E. 2d 1, 156 A.L.R. 644; Lincoln Mills v. Textile Workers Union, 5 Cir., 1956, 230 F.2d 81 (arbitration order denied on other grounds).

It should be noted in passing that the Supreme Court has recently reaffirmed its ruling that an order denying a stay of an action for damages in favor of arbitration is "refusal of an 'injunction' under" 28 U.S.C. § 1292. Baltimore Contractors, Inc. v. Bodinger, 1955, 348 U.S. 176, 180, 75 S.Ct. 249, 252, 99 L. Ed. 233. Whether the same characterization would be applied to an order affirmatively compelling arbitration need not be decided, for the Baltimore Contractors case and its predecessors were treating the stay order as an "injunction" only for the purpose of determining appealability under 28 U.S.C. § 1292 (1), as is obvious from the opinions. What is an "injunction" for that statutory test would seem to have little relevance to what is an "injunction" in the wholly different context of the Norris-LaGuardia Act. Cf. Shanferoke Coal & Supply Corp. of Delaware v. Westchester Service Corp., 1935, 293 U.S. 449, 452, 55 S.Ct. 313, 79 L.Ed. 583. See also Goodall-Sanford, Inc., v. United Textile Workers, 1 Cir., 233 F.2d 104.

It is significant, while still at the verbal level, that within the Norris-La-Guardia Act itself a distinction is made in the breadth of the bars imposed on equitable relief. The sections that might be relevant here all deny jurisdiction to issue an "injunction", §§ 4, 5, 7, 9, 10, or "injunctive relief", § 8. In contrast is § 3, where the so-called "yellow dog contract" is declared to be not enforceable in the federal courts by "the granting of legal or equitable relief". Congress might have more broadly withdrawn all "equitable relief" in § 7, and its use instead of the phrase "temporary or permanent injunction", in view of the clear desire for stringency in this Act, suggests that a narrower intent was deliberate.

More significant is the fact that the Norris-LaGuardia Act has been interpreted as not even withdrawing all "injunctive relief." Virginian Ry. Co. v. System Federation No. 40, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789; Graham v. Brotherhood of Locomotive

Firemen and Enginemen, 1949, 338 U.S. 232, 70 S.Ct. 14, 94 L.Ed. 22. Those cases might once have been explainable as resting upon special factors in the terms or history of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., but the Supreme Court has quite recently extended the power to enjoin racial discrimination exercised in the Graham case to the case of a union subject to the National Labor Relations Act, apparently considering the possible differences between the two Acts as not worthy of comment. Syres v. Oil Workers Union, 1955, 350 U.S. 892, 76 S.Ct. 152.

Basically, it is the language and background of the Norris-LaGuardia Act itself which point to the conclusion that the restrictions of § 7 do not have to be met as a prerequisite to jurisdiction to grant an order compelling arbitration. Section 7 requires certain preliminary allegations and findings: a threat of unlawful acts leading to substantial injury to property, greater injury to complainant in denying relief than to defendants in granting it, and the inability of the public officials charged with protection of property to furnish adequate protection. Procedural requirements include notice to said public officials and an undertaking for reimbursement by complainant and a surety. These provisions were obviously aimed to limit injunctions to cases involving violent or destructive acts. See also § 9. The enumerated requisites, which draw a logical line in relation to union conduct in strikes and picketing (and perhaps to some employer activities), are not at all compatible with the situation where one party merely demands that the other be compelled to arbitrate a grievance in accordance with a contract provision for arbitration, in which latter situation the required findings seldom, if ever, could be made either affirmatively or negatively. They just do not sensibly apply. We do not believe Congress intended § 7 in any case to be a snare and a delusion, holding out the possibility of jurisdiction but demanding for its exercise sworn allegations of inapposite facts.

Congress had no hostility to arbitration as such, as is demonstrated by § 8 of the Norris-LaGuardia Act, which denies injunctive relief to any complainant "who has failed to make every reasonable effort to settle such dispute * * with the aid of any available governmental machinery of mediation or voluntary arbitration." See Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 1944, 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. Indeed, the general purpose of the Act to encourage the development of free collective bargaining, while it should not be taken broadly as an argument for an interpretation excluding from the coverage of the Act all decrees for specific performance of contracts, may properly be invoked as additional support for our conclusion with respect to specific performance of the promise to arbitrate, as was done in Wilson Bros. v. Textile Workers Union, D.C.S.D.N.Y.1954, 132 F.Supp. 163, appeal dismissed 2 Cir., 1955, 224 F.2d 176, and Local 207, United Elec. Radio and Mach. Workers of America v. Landers, Frary & Clark, D.C. D.Conn.1954, 119 F.Supp. 877. See also Virginian Ry. Co. v. System Federation No. 40, supra, 300 U.S. at page 563, 57 S.Ct. 592; Comment, 21 U.Chi.L.Rev. 251, 258–61 (1954).

Many of the cases dealing with demands for equitable enforcement of collective bargaining agreements have simplified the problem of the Norris-LaGuardia Act by use of what was deemed to be the appropriate label—"injunction," to deny relief, or "specific performance," to grant it—and they have tended not to distinguish between different types of equitable remedies in this regard. Therefore, we have not been persuaded by such cases denying relief as Associated Telephone Co. v. Communication Workers, supra; International Longshoremen's and Warehousemen's Union v. Libby, McNeill & Libby, D.C.D. Hawaii 1953, 114 F.Supp. 249; Id., 115 F.Supp. 123, aff'd on other grounds 9 Cir., 1955, 221 F.2d 225. Nor does our conclusion rest on similar decisions granting relief, such as Textile Workers

Union of America, C.I.O., v. Aleo Mfg. Co., D.C.M.D.N.C.1950, 94 F.Supp. 626; Milk and Ice Cream Drivers and Dairy Emp. Union, Local No. 98 v. Gillespie Milk Products Corp., 6 Cir., 1953, 203 F. 2d 650.

Other cases, correct on their own facts, have often been cited, erroneously we think, as authority for denying equitable relief in all circumstances. E.g., Alcoa S.S. Co., Inc., v. McMahon, supra (§ 4 activity, as in the Mead case); Amazon Cotton Mill Co. v. Textile Workers Union, 4 Cir., 1948, 167 F.2d 183 (unfair labor practice). In addition, there are cases which are frequently cited in support of the grant of an equitable remedy, although they seem only to have assumed that some equitable relief could be given, without mentioning the Norris-LaGuardia Act. See A. F. L. v. Western Union Telegraph Co., 6 Cir., 1950, 179 F.2d 535; Textile Workers Union of America, C. I. O. v. Arista Mills Co., 4 Cir., 1951, 193 F.2d 529, 534. Also silent on the effect of the Norris-LaGuardia Act were some of the cases dealing with the United States Arbitration Act, 9 U.S. C. § 1 et seq., which will be discussed below.

Thus we do not consider that our answer to the Norris-LaGuardia problem was either foreclosed or required by prior authority. It is supported directly by a few cases, one of which, although citing opinions on which we do not rely, aptly summed up the analysis made above: "The general structure, detailed provisions, declared purposes, and legislative history of that statute [Norris-LaGuardia Act] show it has no application to cases where a mandatory injunction is sought to enforce a contract obligation to submit a controversy to arbitration under an agreement voluntarily made." Textile Workers Union of America v. American Thread Co., D.C.D.Mass.1953, 113 F.Supp. 137, 142; cf. Local 207, United Elec. Radio and Mach. Workers of America v. Landers, Frary & Clark, supra, 119 F.Supp. at page 879; Wilson Bros. v. Textile Workers Union, supra, 132 F.Supp. at page 165–166.

 One final objection to our ruling should be discussed. It has been argued in these cases that no arbitration order could be given against a union under the Norris-LaGuardia Act, and therefore that the concept of mutuality of remedy requires that the same order against the employer be denied. The reply is two-fold. Our ruling herein, that an order to compel arbitration is neither barred specifically by § 4 nor subject to the requirements of § 7, means that such an order could be granted against either party to a labor dispute without violating the Act. The same is true of an order to stay a lawsuit in favor of arbitration. If the union's breach of an arbitration promise should take the form of a strike, however, our prior holding in the Mead case applies, so that the order to arbitrate could not be accompanied by an injunction against the strike. Continuation of the strike theoretically is not a barrier to an arbitration, although practically it may be, in some cases, either because the employer deems it unfair to arbitrate in the face of a strike or because an arbitrator will not sit in those circumstances. See Cox, "Grievance Arbitration in the Federal Courts," 67 Harv.L.Rev. 591, 603–606 (1954). But the employer is not without remedies for such a continuing breach, even though the Norris-LaGuardia Act precludes the swift, effective injunctive remedy. See Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., supra, 321 U.S. at pages 62–63, 64 S.Ct. 413; International Brotherhood of Teamsters, etc., v. W. L. Mead, Inc., 1 Cir., 230 F.2d 576. In the second place, although the Norris-LaGuardia Act is not a "one-way street" (see S.Rep. No. 163, 72d Cong., 1st Sess. 19 (1932)), it certainly was intended and has application mainly as a protection for union and employee activities. Where its terms can be read to include employer conduct, that conduct should also be protected. See Wollett and Wellington, "Federalism and Breach of the Labor Agreement," 7 Stan.L.Rev. 445, 456, n. 59 (1955). But a realistic view of the way labor relations are carried on shows

that there are few instances where this is the case. It would therefore be anomalous to read into the Act a requirement of exact mutuality of remedies, whatever force that concept may have in other contexts. Equitable relief against any party, if available under the holding of this opinion, must be molded, where necessary, to stay out of the "forbidden territory" delimited by the Norris-LaGuardia Act. Cf. Fitzgerald v. Abramson, D.C.S.D.N.Y.1950, 89 F.Supp. 504, 512.

## II.

This case is not disposed of by holding that the Norris-LaGuardia Act does not negative the existence of jurisdiction, for the plaintiff cannot prevail in the end unless there is also an affirmative basis upon which to grant the remedy sought. In view of its disposition of the Norris-LaGuardia issue, the court below did not reach this question. Since it is purely a question of law, and was fully briefed and argued here, we proceed to resolve it in the first instance.

Preliminary to our task, however, is the choice of law problem: In this suit under § 301, do we look to federal or state sources to determine the availability of specific enforcement as remedy for breach of a promise to arbitrate? This is the problem largely left open by our second opinion in International Brotherhood of Teamsters, etc., v. W. L. Mead, Inc., 1 Cir., 230 F.2d 576, wherein we held that § 301 was a constitutional exercise of the power of Congress to confer jurisdiction on the lower federal courts, regardless of the source of the law used to resolve certain issues determinative of the merits of a § 301 case. We did suggest certain specific points, by way of illustration, as to which federal law would certainly rule the controversy, even though Congress might perhaps have chosen to leave other matters to be determined by an application of state law—a point we found it unnecessary to determine.

Of course, if § 301 created a "generally applicable and uniform federal substantive right", as well as "a remedy * * * and * * * a forum in which to enforce it", as the enactment was described in Shirley-Herman Co., Inc., v. International Hod Carriers, etc., Union, 2 Cir., 1950, 182 F.2d 806, 809, then there would be no question that federal law is applicable to all issues, whether deemed substantive or procedural.

■■ If, on the other hand, a federal court in a § 301 case may have to determine at least some substantive issues by reference to state law—which possibly is so—then the problem of choice of law governing the "forms and mode" of enforcing an arbitration agreement must necessarily be faced. Our answer in that event is in accord with the reasoning of Judge Wyzanski in Textile Workers Union of America v. American Thread Co., supra, 113 F.Supp. at pages 141–142, relying on "the traditional rule that the availability of specific performance is a matter not of right, but of remedy, and that like other matters of remedy it is governed by the law of the forum. Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582 * * *".

■■ However, we must fit this conclusion into the analysis of arbitration enforcement recently made by the Supreme Court in Bernhardt v. Polygraphic Co., 1956, 350 U.S. 198, 76 S.Ct. 273. In that case, a damage action based on a written contract for the employment of an individual that included an arbitration clause, jurisdiction was founded solely on diversity of citizenship. One issue was the applicability of the doctrine of Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to the question of whether the lawsuit should be stayed in favor of arbitration. The Supreme Court held that "the remedy by arbitration * * * substantially affects the cause of action created by the State", 350 U.S. at page 203, 76 S.Ct. at page 276, thereby invoking the test of Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108–109, 65 S.Ct. 1464, 1469, 89 L.Ed. 2079, so that the question for that reason had to be decided accord-

ing to state law, as if the district court were "only another court of the State". In our opinion the ruling in the Bernhardt case has no bearing on a suit under § 301. As we explained in our second opinion in the Mead case, supra, jurisdiction in a § 301 case is not based upon diversity of citizenship. Rather, it is based upon that provision of Art. III of the Constitution which extends the judicial power of the United States to cases "in Law and Equity, arising under * * the Laws of the United States * * *."

■ Prior to the Erie decision, it was well accepted that the means for enforcing an arbitration agreement properly fell in the category of remedy or procedure. Red Cross Line v. Atlantic Fruit Co., 1924, 264 U.S. 109, 123–125, 44 S.Ct. 274, 68 L.Ed. 582 (state statute); Marine Transit Corp. v. Dreyfus, 1932, 284 U.S. 263, 277–279, 52 S.Ct. 166, 76 L.Ed. 282, U. S. Arbitration Act. The York case, while recognizing that such questions normally are for the forum's own law, ruled that questions otherwise classified as questions of remedy and procedure must be determined in a diversity case according to state law when they may substantially affect the outcome of the case. That opinion and its progeny down to the Bernhardt case have emphasized the special demands of the diversity jurisdiction, as explained in the Erie and York opinions, as the basis for their rulings, and have given some indications of intent to limit to diversity cases their extensive reference to state "procedural" law. E.g., see Guaranty Trust Co. of N. Y. v. York, supra, 326 U.S. at page 101, 65 S.Ct. 1464; Bernhardt v. Polygraphic Co., supra, 350 U.S. at pages 202–203, 208, 76 S.Ct. 273. In other cases, considerations relevant to diversity suits have been held inapplicable where federal jurisdiction rested on other grounds, so that state procedural rules were not carried over even though the case involved some use of state law, Holmberg v. Armbrecht, 1946, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, or was founded on a state cause of action for wrongful death adopted as part of the " 'general maritime law' " enforceable in admiralty, Levinson v. Deupree, 1953, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319. See Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834, 842 note 6. Therefore we believe that in a § 301 case the Erie, York and Bernhardt decisions do not require us to apply state law concerning the "forms and mode" of enforcing an arbitration agreement.

This conclusion drawn from examination of the post-Erie cases is reenforced by recalling that the remedial powers of a federal court in a labor controversy are sharply restricted. The many limitations thrown up by provisions of Title 28, by the Norris-LaGuardia Act, and by § 301 itself must be complied with in any event, as the first section of this opinion illustrates. Cf. Guaranty Trust Co. of N. Y. v. York, supra, 326 U.S. at page 105, 65 S.Ct. 1464. Reference in addition to state law for the availability and forms of specific enforcement would complicate and hamper the district court's observance of the limits Congress has imposed. That is especially true because the enforceability of arbitration agreements varies considerably among the states. Some grant no specific enforcement, others expressly deny it to collective bargaining contracts; many limit enforcement to agreements submitting an existing dispute, others enforce agreements to submit future disputes only if restricted to disputes that could be the subject of a lawsuit. Few states have provisions of effective scope for specific enforcement of labor arbitration promises. See Gregory and Orlikoff, "The Enforcement of Labor Arbitration Agreements," 17 U.Chi.L.Rev. 233, 240–242 (1950). In Massachusetts, it is not at all clear what is the present status of such enforcement. See Mass.G.L.(Ter.Ed.) C. 251, § 14, Sanford v. Boston Edison Co., 1944, 316 Mass. 631, 636, 56 N.E.2d 1, 156 A.L.R. 644; Mass.G.L.(Ter.Ed.) C. 150, § 11, Magliozzi v. Handschumacher & Co., 1951, 327 Mass. 569, 99 N.E.2d 856; Cox, "Legal Aspects of Labor Arbitration in New England," 8 Arb.J. (N.S.) 5, 9–13 (1953).

### III.

This brings us to the availability and appropriateness, as a federal equitable remedy in a § 301 case, of a decree for specific performance of an agreement to arbitrate. In this connection, we do not forget the historic hostility of the judges, both at common law and in equity, to agreements for the submission of disputes to arbitration, and their manifested unwillingness to give such agreements full effect. Thus, while a valid award was enforceable at law or in equity, failure to satisfy all of the numerous formal or procedural rules would render an award invalid. Specific performance of a submission to arbitration was granted if the submission had been made a rule of court or was limited to subsidiary issues in a lawsuit. But the specific enforcement of arbitration in general was barred by a pair of complementary rules that left nominal damages as the only remedy for breach of the promise to arbitrate: A submission was revocable by either party until the award was rendered; an agreement to submit future disputes to arbitration was invalid as an ouster of the jurisdiction of the courts. See Gregory and Orlikoff, supra at 235–238.

■■■ These rules were long embedded in the decisions of the federal, as well as state and English, courts. See Red Cross Line v. Atlantic Fruit Co., supra, 264 U.S. at pages 120–123, 44 S.Ct. 274; United States Asphalt Refining Co. v. Trinidad Lake Petroleum Co., D.C.S.D. N.Y.1915, 222 F. 1006. A generation or more ago Congress and many state legislatures were persuaded by the advocates of arbitration to reject this body of doctrine by enacting arbitration statutes. In perhaps only two states was the change accomplished by judicial overruling of the common-law restrictions on specific enforcement. See Gregory and Orlikoff, supra at 254. That history convinces us that the hoary though probably misguided judge-made reluctance to give full effect to arbitration agreements cannot now be ignored by us as a matter of federal law without a pretty explicit statutory basis for so doing. But cf. Bernhardt v. Polygraphic Co., supra, 350 U.S. at pages 209–212, 76 S.Ct. 273 (concurring opinion).

Practical grounds support this conclusion. A glance at a typical arbitration statute shows that it lays down procedural specifications for use of the new power to compel arbitration. Topics covered may include requisites of a submission, selection of an arbitrator, procedure and subpoena power for the arbitrator, stay and specific enforcement authority in a court, grounds and procedure for confirming or vacating an award. A court decision could overrule the common law bars to specific enforcement, but could not substitute for them the comprehensive and consistent scheme that legislative action could afford, and which is necessary for effective yet safeguarded arbitration.

■■■ A number of courts have held that § 301 itself is a legislative authorization for decrees of specific performance of arbitration agreements. E. g., Textile Workers Union v. American Thread Co., supra; Wilson Bros. v. Textile Workers Union, supra; Local 207, Elec., etc., v. Landers, Frary & Clark, supra; Evening Star Newspaper Co. v. Columbia Typographical Union, D.C.D.C. 1954, 124 F.Supp. 322; cf. Milk and Ice Cream Drivers, etc., Union v. Gillespie Milk Products Corp., supra. We think that is reading too much into the very general language of § 301. The terms and legislative history of § 301 sufficiently demonstrate, in our view, that it was not intended either to create any new remedies or to deny applicable existing remedies. See H.R.Rep.No. 245, 80th Cong., 1st Sess. 46 (1947); H.R.Rep.No. 510 (Conference Report), 80th Cong., 1st Sess. 42 (1947); 93 Cong. Rec. 3734, 6540 (daily ed. 1947). Arbitration was scarcely mentioned at all in the legislative history. Furthermore, the same practical consideration that militates against judicial overruling of the common law doctrine applies against interpreting § 301 to give that effect. The most that could be read into it would

be that it authorizes equitable remedies in general, including decrees for specific performance of an arbitration agreement. Lacking are the procedural specifications needed for administration of the power to compel arbitration. For example, in the American Thread case Judge Wyzanski deemed the U. S. Arbitration Act inapplicable, but no sooner had he ruled that § 301 authorized a decree for specific performance than he was faced with the need to adopt "as a guiding analogy" the procedure of § 5 of the U. S. Arbitration Act with respect to one such detail, the appointment of an arbitrator. 113 F.Supp. at page 142. Thus it seems to us that a firmer statutory basis than § 301 should be found to justify departure from the judicially formulated doctrines with reference to arbitration agreements.

### IV.

The federal statute that does contain an integrated system for compelling arbitration is the United States Arbitration Act, first passed in 1925, 43 Stat. 883 and then codified and enacted into positive law as Title 9 of the U.S.Code in 1947, 61 Stat. 669, with one subsequent technical amendment, 68 Stat. 1233.

The structure of the Act is as follows: Section 2, subject to definitions and an exclusion in § 1, provides that:

"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

If a suit is brought in a federal court, and the court "being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement," § 3 requires that it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement," providing the applicant is not in default in proceeding with the arbitration. And specific performance, the remedy sought in the instant case, is authorized in § 4 in these terms:

"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement."

That section goes on to detail the procedure for litigating defenses to such an order. Further details of procedure in court and before the arbitrator are given in §§ 6–8, 12–13. As already noted, § 5 provides a method for appointing an arbitrator, where necessary. Finally, §§ 9–11 state the effect of an award and detail the grounds for confirming, vacating, modifying, or correcting an award.

The heart of the Act is contained in §§ 2, 3, 4. Although each of them states its scope in different terms, it has now been authoritatively held that § 2 defines the scope of § 3, on a basis that implicitly reaches § 4, as well. Bernhardt v. Polygraphic Co., supra, 350 U. S. at 201–202, 76 S.Ct. 273. Thus the remedy of an original action for specific performance under § 4 is available only as to an arbitration agreement contained in the types of contracts defined by § 2 as qualified by § 1.

It is not usual terminology to refer to a labor contract as "evidencing a transaction involving commerce", but the Bernhardt opinion suggests that under proper circumstances an individual contract of hire would meet the test of §

2. For the Court ruled § 2 inapplicable to the situation of the particular employee involved in that case by saying, 350 U.S. at 200–201, 76 S.Ct. 273, 275:

"Nor does this contract evidence 'a transaction involving commerce' within the meaning of § 2 of the Act. There is no showing that petitioner while performing his duties under the employment contract was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce, within the meaning of our decisions."

If the employment contract there involved would have been subject to § 2 had such a showing been made, then a collective bargaining contract should *a fortiori* be held to be within the scope of § 2. Although it does not consummate the employment relationship, which may be the "transaction," the collective agreement sets the terms and conditions under which not one but hundreds or thousands of workers are employed, and thus "involves" commerce to a greater degree than any single hiring transaction could. Cf. NLRB v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893; J. I. Case Co. v. NLRB, 1944, 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762. We conclude that a collective bargaining agreement may be within the terms of § 2. See Sturges and Murphy, "Some Confusing Matters Relating to Arbitration under the United States Arbitration Act," 17 Law & Contemp.Prob. 580, 617–619 (1925); Cox, "Grievance Arbitration in the Federal Courts," supra, 67 Harv.L.Rev. at 598–599. Perhaps this is not so with respect to a collective bargaining agreement whose arbitration clause is not limited to controversies "arising out of such contract or transaction, or the refusal to perform the whole or any part thereof," as provided in § 2 of the Arbitration Act. See Metal Polishers, etc., Union v. Rubin, D.C.E.D. Pa.1949, 85 F.Supp. 363. We express no opinion on that question; the arbitration clause in suit is limited to "Any matter involving the application or interpre-

tation of any provisions of this Agreement * * *."

Section 2, however, must be read in connection with § 1, which, after defining "maritime transactions" and "commerce" in familiar terms, concludes with these enigmatic words:

"but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce."

The Bernhardt case indicates clearly that this exclusion pertains to the entire Act. 350 U.S. at 201–202, 76 S.Ct. 273. We have then reached the ultimate major question of this appeal: Is a collective bargaining agreement a "contract of employment" within the meaning of § 1? We hold that it is not.

The term in question admittedly is not a "word of art" with a fixed technical definition, but it seems more familiar today as an equivalent to what once was called the "contract of hire," referring to an individual transaction, rather than as a generic term that would also embrace union-negotiated collective agreements. The distinction between the two concepts (and a suggestion of the difficulty of definition) appears in a well-known quotation from Mr. Justice Jackson's opinion for the Supreme Court in J. I. Case Co. v. NLRB, supra, 321 U.S. at pages 334–335, 64 S.Ct. at page 579:

"Contract in labor law is a term the implications of which must be determined from the connection in which it appears. Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a *contract of employment* except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agree-

ment, rather than in a *contract of employment*." [Italics added.]

Compare the language used in § 3 of the Norris-LaGuardia Act to define a "yellow dog contract," which of course would not be a union contract: "Every undertaking * * * in any contract or agreement of hiring or employment between any [employer] * * * and any employee or prospective employee * *." 47 Stat. 70. But see Amalgamated Ass'n of St. Elec. Ry. and Motor Coach Emp., etc., v. Pennsylvania Greyhound Lines, Inc., 3 Cir., 1951, 192 F.2d 310, 313, 65 Harv.L.Rev. 1239 (1952). See also Cox, "Grievance Arbitration in the Federal Courts," supra, 67 Harv.L.Rev. at 595–597.

If the words of § 1 do not have a "plain meaning," the legislative history does not conclusively make them plainer. The committee reports and hearings in the Congress which passed the Act contain only one reference—an ambiguous one—to the meaning of the exclusion. See Joint Hearings before Subcommittees of Committees on Judiciary on S. 1005 and H.R. 646, 68th Cong., 1st Sess. 21 (1924); S.Rep. 536 and H.R.Rep. 646, 68th Cong., 1st Sess. (1924). The whole tenor of these documents, however, demonstrates that congressional attention was being directed at that time solely toward the field of commercial arbitration. The history of the arbitration bill before the previous Congress and in the American Bar Association committee which had drafted it shows that the exclusion was inserted to overcome an objection by the Seamen's Union. But even this bit of history is ambiguous as to whether the objection was made with reference to union arbitration or individual arbitration of seamen's wage disputes. Compare Tenney Engineering, Inc., v. United Elec., etc., Workers, 3 Cir., 1953, 207 F. 2d 450, 452, with 65 Harv.L.Rev. 1240. When this basically weak type of legislative history is conceivably explainable on other grounds, such as objection to a new form of arbitration for seamen's individual contracts of hire (see 46 U.S. C.A. § 651), we cannot attribute much

force to it against a reading of the statutory language itself.

Court decisions are divided on the breadth of the exclusion in § 1 of the U. S. Arbitration Act. Three circuits have held that it includes collective bargaining agreements. Amalgamated Ass'n of St. Elec. Ry. and Motor Coach Emp., etc., v. Pennsylvania Greyhound Lines, Inc., 3 Cir., 1951, 192 F.2d 310; United Elec., Radio and Mach. Workers of America v. Miller Metal Products, Inc., 4 Cir., 1954, 215 F.2d 221; Lincoln Mills of Ala. v. Textile Workers Union, 5 Cir., 1956, 230 F.2d 81. See also Mercury Oil Refining Co. v. Oil Workers Intern. Union, 10 Cir., 1951, 187 F.2d 980, 983; Shirley-Herman Co., Inc., v. International Hod Carriers, etc., Union, 2 Cir., 1950, 182 F.2d 806, 809. But cf. Markel Electric Products, Inc., v. United Electrical, etc., Workers, 2 Cir., 1953, 202 F.2d 435. Despite this position, the Third Circuit will apply the Act to most collective bargaining contracts, on its view that exclusion only refers to collective agreements of transportation workers. Tenney Engineering, Inc., v. United Electrical, etc., Workers, 3 Cir., 1953, 207 F.2d 450.

On the other hand, the Sixth Circuit, while denying a stay under § 3 on other grounds, has squarely ruled that the exclusion covers only a "contract for the hiring of individuals," distinguishing its earlier cases apparently as being suits for wages upon contracts of hire incorporating the terms of a collective bargaining agreement. Hoover Motor Express Co., Inc., v. Teamsters, etc., Union, 6 Cir., 1954, 217 F.2d 49, 52–53. Accord, Lewittes & Sons v. United Furniture Workers, D.C.S.D.N. Y.1951, 95 F.Supp. 851; see United Electrical, etc., Workers v. Oliver Corp., 8 Cir., 1953, 205 F.2d 376, 385; Wilson Bros. v. Textile Workers Union, supra, D.C.S.D.N.Y., 132 F.Supp. at page 165; Tenney Engineering, Inc., v. United Electrical, etc., Workers, supra, 207 F.2d at pages 454–455 (concurring opinion). The question was expressly passed over

in the American Thread case, supra, 113 F.Supp. at page 139.

With the legislative history and judicial treatment in the condition just described, we feel free to consider the statutory provision as carrying its own full meaning in what it says. The term "contracts of employment" serves to define in part the scope of a statute which created a governing code for a newly important system of adjudicating controversies, and which has assumed permanent status by codification. It may well be that the attention of Congress was focused on the field of commercial arbitration in 1925, because the proposed legislation was being pressed by advocates of commercial arbitration. Nevertheless, in enacting the Arbitration Act, Congress chose not to use apt language to confine the application of the Act to the field of commercial arbitration. If it be assumed that only in the period subsequent to 1925 did arbitration under collective bargaining agreements emerge as a factor of major importance, the most that could be inferred from that would be that Congress did not specifically advert to arbitration under collective bargaining agreements. But such inference would not be enough to warrant an interpretation excluding collective bargaining agreements from the coverage of the Arbitration Act. It would be necessary to go further and to conclude that, had Congress in 1925 foreseen the developing importance of arbitration under collective bargaining agreements, it "would have so varied its comprehensive language as to exclude it from the operation of the act." People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 257, 58 S.Ct. 167, 169, 82 L.Ed. 235. There is no reason to suppose that this would have been so. Therefore, we hold that the exclusion in § 1 does not embrace collective bargaining agreements, as distinguished from individual "contracts of employment", and that the Arbitration Act applies to collective bargaining agreements within the limitations of other sections of the Act.

Some of those limitations have already been noted. Another which must be discussed is the provision of § 4 which authorizes specific enforcement of an agreement to arbitrate by a district court "which, *save for such agreement,* would have jurisdiction * * * of the subject matter of a suit arising out of the controversy between the parties * * *." [Italics added.] Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 1955, 348 U.S. 437, 460, 75 S.Ct. 489, 500, 99 L.Ed. 510, has sharply curtailed the subject-matter jurisdiction of federal courts under § 301 to adjudicate directly between union and employer a controversy over "terms of a collective agreement relating to compensation, terms peculiar in the individual benefit which is their subject matter and which, when violated, give a cause of action to the individual employee." One court has already held that if the district court is barred by the Westinghouse decision from granting pecuniary relief on a wage controversy, it also lacks jurisdiction, by the terms of § 4, to compel arbitration of that dispute. Textile Workers Union v. Williamsport Textile Corp., D.C.M.D.Pa. 1955, 136 F.Supp. 407. However, the effect of the Westinghouse holding, reflected in all the opinions of the majority justices, was to eliminate from § 301 jurisdiction a complaint by a union that involves no more than a cause of action which is "peculiar in the individual benefit" or "the uniquely personal right of an employee" or which "arises from the individual contract between the employer and employee". 348 U.S. at pages 460, 461, 464, 75 S.Ct. at pages 500, 501, 503. That holding was not aimed at any cause of action or remedy that appropriately pertains to the union as an entity, particularly one which an individual employee may have no equal power to enforce. The promise of the employer to arbitrate, which frequently is linked in the contract or in negotiations with a union no-strike pledge, seems to us to be at the forefront of the contract terms for whose breach only the union can effec-

tively seek redress, and for whose breach § 301 should therefore still be an appropriate source of jurisdiction. Indeed, the history of litigation under § 301 shows that if cases seeking to compel an employer to arbitrate were thrown into the discard along with Westinghouse-type cases and those barred for trenching on exclusive NLRB jurisdiction, there would be no significant use a union could make of § 301. Its terms and legislative history demonstrate that, as we have earlier said of the Norris-La-Guardia Act, it was not intended to be strictly a "one-way street." The Westinghouse opinions show no intent to create any such result. It seems to us therefore that that decision is to be interpreted as denying jurisdiction over a controversy only where the union is seeking a remedy, usually a judgment for damages, which the individual employee equally could enforce in a suit on his personal cause of action. On that analysis, "jurisdiction * * * of the subject matter of a suit arising out of the controversy" will exist so long as the union is not asking for the relief available to the individual employee, and thus the test of § 4 will be satisfied by a complaint which meets the terms of § 301 itself. Cf. Wilson Bros. v. Textile Workers Union, supra, 132 F.Supp. at page 166.

### V.

The case will therefore be remanded for further proceedings under the Arbitration Act. Since our decision makes clear for the first time in this circuit that that Act is applicable, the district court should now permit the parties to amend their pleadings so as to allege, respectively, compliance with the requisites of the Act and defenses afforded by it.

■■■ We have not passed upon the question of the arbitrability of the two grievances at issue here, although counsel for defendant informed us that the Company denies that they are arbitrable under the contract. Arbitrability is a question which the district court must pass on in the first instance. By way of guidance, it may be appropriate to note here a brief comment on some general principles. The scope of an arbitration pledge is solely for the parties to set, and thus the determination of whether a particular dispute is arbitrable is a problem of contract interpretation. See, e. g., International Union United Furniture Workers, etc., v. Colonial Hardwood Flooring Co., Inc., 4 Cir., 1948, 168 F.2d 33; Markel Electric Products, Inc., v. United Electrical Workers, supra (majority and dissenting opinions). However, an arbitration clause, either expressly or by broadly stating its scope to include disputed interpretations of any contract term, may refer the very question of arbitrability to the arbitrator for decision. That is, just as a court has jurisdiction to determine its own jurisdiction, the arbitrator in such a case has power to interpret the scope of the arbitration terms of the contract, including questions of whether the dispute at issue is made arbitrable therein and whether the applicant has satisfied the contract procedures prerequisite to arbitration. See, e. g., Wilson Bros. v. Textile Workers Union, supra, 132 F. Supp. at pages 164–165; Insurance Agents' Union v. Prudential Ins. Co., D.C.E.D.Pa.1954, 122 F.Supp. 869, 872. Thus the district court must first determine whether the contract in suit puts matters of arbitrability to the arbitrator or leaves them for decision by the court. If it is the latter, the court must decide such points before it can give relief under §§ 3 or 4 of the Arbitration Act. If it is the former, and the applicant's claim of arbitrability is not frivolous or patently baseless, an order can be given, with the decision on arbitrability to be made in the arbitration proceedings that follow, subject of course to §§ 10–11 of the Act. See, e. g., Local 379 of Intern. Union, etc., v. Jacobs Mfg. Co., D.C.D.Conn.1953, 120 F.Supp. 228. See also Goodall-Sanford, Inc., v. United Textile Workers, 1 Cir., 233 F.2d 104.

### VI.

■■■ Plaintiff has submitted a motion to this court, under 28 U.S.C. § 1653, to amend its complaint so as to allege di-

versity of citizenship between all the members of the Union and defendant, no doubt as a hedge against a ruling that relief could not be granted under the law applicable to a federal question case. In view of our decision, this motion may have become moot, but it must in any event be denied, for it cannot accomplish the result intended. Rule 17(b) Fed. Rules Civ.Proc., 28 U.S.C.; Donahue v. Kenney, 1951, 327 Mass. 409, 99 N.E.2d 155; Worthington Pump & Machinery Corp. v. Local 259, etc., D.C.D.Mass.1945, 63 F.Supp. 411, 413.

The judgment of the District Court is vacated, and the case is remanded to that court for further proceedings not inconsistent with this opinion.