**BOSTON PRINTING PRESSMEN'S UNION**

v.

**POTTER PRESS.**

Civ. A. No. 56–155.

United States District Court
D. Massachusetts.
May 29, 1956.

**554**

Robert M. Segal, Boston, Mass., John S. McLellan, Hugh E. Reams, Kingsport, Tenn., of counsel, for plaintiff.

Edward Schneider, Harold Rosenwald, Boston, Mass., for defendant.

WYZANSKI, District Judge.

Defendant moves to dismiss plaintiff's complaint primarily on the grounds that it fails to state a "case" or "controversy" within U.S.Const. Art. III, § 2, and that, if it does, it fails to state "an existing controversy arising out of a contract" "involving commerce" within the meaning of § 2 and other parts of the United States Arbitration Act of July 30, 1947, c. 392, § 2; 61 Stat. 669; 9 U.S.C. §§ 1, 2 et seq.

Stated summarily, plaintiff's complaint seeks a mandatory injunction enforcing the parties' written agreement to submit to arbitration a new contract to govern employment conditions at defendant's plant following the expiration on September 1, 1954, of their collective bargain. In short, the Court is asked to direct what may conveniently be described as a *prospective* or *quasi-legislative* arbitration establishing future labor conditions not *specifically* envisaged in their earlier contract. This is, at least with respect to industrial labor problems, a novel problem not hitherto adjudicated by a federal court acting under the asserted authority of § 301 of the Taft-Hartley Labor Management Relations Act of 1947, 61 Stat. 156, 29 U.S.C.A. § 185.

Defendant is a Massachusetts corporation, conducting in Waltham, a printing business, which, for present purposes, may be assumed to be engaged in interstate commerce. October 20, 1952, it entered into a written collective bargain with plaintiff, as exclusive collective bargaining representative for printing pressmen and apprentice pressmen. That bargain was to be effective to September 1, 1954, and further provided in Section XVII:

"It is also agreed that all questions regarding a new contract and scale to become effective at the expiration of this Agreement, which cannot be settled by conciliation, shall be decided by arbitration as above provided, and this Agreement shall remain in force until all differences are settled by conciliation or arbitration."

The reference to what was "above provided" is an incorporation of detailed ar-

bitration procedure in Section XVI of the contract, to this effect:

"Whereas the parties to this agreement are desirous of effecting and maintaining harmonious relations between Employer and Employees, it is hereby mutually agreed that a joint standing committee composed of two (2) representatives of the party of the first part shall be selected by them and a like committee of two (2) representatives of the parties of the second part shall be selected by the Union, and to this committee shall be referred all questions that may arise affecting this contract and scale of prices; the construction to be placed upon any clause or clauses of this agreement or scale or any violation thereof which cannot be settled otherwise, and in case of absence or refusal of either of such representatives to act, another shall be appointed in his place.

"If any difference arises which cannot be settled through action by the joint standing committee, both parties agree to refer such differences to arbitration. In the event that any difference or differences are submitted to arbitration, two (2) members of the party of the first part, and two (2) members of the party of the second part shall agree upon the appointment of a disinterested party, and in the event that the parties fail to agree upon the appointment of a disinterested party, such disinterested party shall be appointed by the American Arbitration Association, and such disinterested party shall act as the Chairman of the Board, and all such differences shall be referred to him within a period of ten (10) days, and a decision on all questions in dispute shall be rendered within a period of not more than fifteen (15) days from the date on which this matter was referred to him, and that pending the settlement of question or questions by conciliation or arbitration, work shall be carried on without interference or interruption in a regular and orderly manner, and the existing conditions shall prevail until the final settlement of the question.

"It is agreed that the procedures herein provided for settling disputes by arbitration shall be used to the exclusion of any other means available to the parties who execute this agreement, it being understood that all arbitration decisions rendered under the terms of this contract are final and binding on both parties. Any rights or remedies otherwise available to the parties to this contract are hereby expressly waived."

June 22, 1954, plaintiff notified defendant of its desire to open the contract and discuss certain changes. Negotiations, including discussion of arbitration, ensued. December 30, 1955, plaintiff in writing formally demanded submission to arbitration of these three unresolved questions regarding a new contract, which had not been settled by conciliation: (1) three weeks' vacation with pay, (2) two additional holidays, and (3) sick and accident program. To this and subsequent letters from plaintiff, defendant by letter dated January 10, 1956, replied that, "It is the position of the Company that Section 17 of the expired contract does not create a valid and enforceable obligation to arbitrate the renewal terms of the contract."

Plaintiff seeks a declaratory judgment that defendant is required to submit to this quasi-legislative arbitration of the three points in dispute to govern their future relations, and plaintiff also seeks an order directing defendant to proceed to arbitrate the unresolved differences on these three points.

■ Defendant's motion canvasses a number of objections. Some of them are not tenable in *this* Court in the light of the judgment entered April 25, 1956, in Local 205, United Electrical, Radio and Machine Workers of America (UE) v. General Electric Co., 1 Cir., 233 F.2d 85. Thus, for this Court the Norris-LaGuar-

dia Act, 47 Stat. 70, 29 U.S.C.A. § 101 et seq., is not an obstacle to granting relief. Nor would it be sound for this Court to conclude that *all* kinds of arbitration under collective bargaining contracts, *quasi-judicial* as well as *quasi-legislative, retrospective* as well as *prospective*, fall outside the permissible ambit of U.S.Const. Art. III, § 2, § 301 of the Labor Management Act of 1947, and the United States Arbitration Act. However, nothing decided by the Court of Appeals in the General Electric case disposes of defendant's contention that there is no constitutional or statutory warrant for enforcement of the particular type of arbitration provision here at stake—a provision admittedly having chiefly a prospective or quasi-legislative impact to govern, or establish the rules for, future labor relations between the parties.

Without so deciding, this Court may assume that there is no infirmity in Art. III, § 2 of the Constitution which precludes Congress from conferring upon courts the power to enforce a quasi-legislative arbitration provision. It is familiar practice for Congress to give federal courts sitting in bankruptcy or corporate reorganization matters the power to prescribe future relations between classes of security holders. And if such judicial allocation of prospective benefits and burdens be a "case" or a "controversy", the alleged difficulties in the justiciability of prospective labor arrangements seem not insuperable. Moreover, the factual data and legal principles considered in determining what is fair value for *past* services (a matter often judicially reviewed) is not noticeably different in practice, nor in theory, from the data and principles which would be considered in determining what would be fair value for *future* services. Those who know customs and contracts in an area and industry could testify before an arbitrator as to their expert experience, and the conclusion arrived at by arbitrators on the basis of such evidence could be tested by a court to see whether an award was arbitrary or in accordance with due process.

Reasoning of this sort may have underlain cases where federal courts have regarded prospective quasi-legislative arbitration as enforceable at least to the extent of a declaratory judgment. Northland Greyhound Lines v. Amalgamated Ass'n, D.C.Minn., 66 F.Supp. 431. Cf. Atchison, T. & S. F. Ry. Co. v. Ferryboatman's Union, 9 Cir., 28 F.2d 26; Atchison, T. & S. F. Ry. Co. v. Brotherhood of L. F. & E., 7 Cir., 26 F.2d 413. And such reasoning may be implicit in the American state and English courts which have gone furthest with disputes as to quasi-legislative arbitration questions. Hotel Concord, East Point Hotels v. Hotel Front Service Employees Union, Sup., 140 N.Y.S.2d 848; Town & James, Inc., v. Barasch, 197 Misc. 1022, 96 N.Y.S.2d 32; Dumas v. Sloviko, Sup., 89 N.Y.S.2d 842; In re Berger, 191 Misc. 870, 79 N.Y.S.2d 490; United Electrical Workers R. M. W. v. National Pneumatic Co., 134 N.J.L. 349, 49 A.2d 295; International Brotherhood T. C. W. H. v. Shapiro, 138 Conn. 57, 82 A.2d 345. See Matter of Carus-Wilson and Greene, 18 Q.B.D. 7. Consider also Gregory and Orlikoff, The Enforcement of Labor Arbitration Agreements, 17 U.Chi.L.Rev. 233; A. Cox, Rights Under A Labor Agreement, 69 Harv.L.Rev. 601, 605. But see H. Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv.L.Rev. 999, 1001–1002; Phillips, The Paradox in Arbitration Law, 46 Harv.L.Rev. 1258; Sturgis and Murphy, Some Confusing Matters Relating to Arbitration Under The United States Act, 17 Law and Contemporary Problems 580; O. Fraenkl, The Legal Enforceability of Agreements To Arbitrate Labor Disputes, 1 Arb.J. 360.

But even if it be assumed that the Constitution authorizes Congress to confer upon Article III Courts the power to enforce quasi-legislative arbitral awards pursuant to collective bargains, there remains the question whether Congress has done so.

Legislation specifically addressed to this problem does not exist. Nothing in the text or history of the Taft Hartley

Act speaks on this precise subject. When in 1925 the first version, and in 1947 the second version, of the United States Arbitration Act were enacted Congress did not explicitly or implicitly cover this point. The whole structure of these enactments is obviously concerned with quasi-judicial, not quasi-legislative, disputes. Each section is on the assumption that what is dealt with is the ordinary, not the extraordinary, grist of the judicial mill. Cf. In Matter of Fletcher, 237 N.Y. 440, 143 N.E. 248.

Furthermore, the problems of quasi-legislative arbitral awards have generally been thought by state courts to be beyond the intended reach of a judicially enforceable arbitration statute, unless, at any rate, the legislature spoke clearly in favor of the widest possible interpretation. In the Matter of Buffalo and Erie Railway Co., 250 N.Y. 275, 165 N.E. 291; Matter of Kallus, 292 N.Y. 459, 55 N.E. 2d 737; Continental Bank Supply Co. v. International Brotherhood of Bookbinders, 239 Mo.App. 1247, 201 S.W.2d 531. And if Congress knew anything of state arbitration statutes it probably intended to incorporate by reference this strict or narrow view in enacting, or at least in reenacting, the United States Arbitration Act.

Perhaps more important than the considerations heretofore stated is the point that this controversy deals not merely with a prospective quasi-legislative arbitral award, but with an award in the delicate area of labor relations. This is to be sure not technically an example of an orthodox attempt at "compulsory arbitration". Yet it comes, in substance, perilously close. The parties who agreed to this prospective award did so voluntarily, but perhaps they did it without envisaging a possible judicial enforcement. Moreover, the national representatives of employers and employees who were faced with the Taft-Hartley bill, and the legislators who enacted it, are not shown to have adverted to the possibility that § 301 of the Labor Management Act of 1947 driven in tandem with the United States Arbitration Act would make judicially enforceable provisions such as Article 17 of the contract now at bar. Indeed, this Court has no information as to whether it is common in labor contracts to have such quasi-legislative provisions; nor, if it is common, whether their enforcement by courts would be desired generally; nor whether such contractual provisions could ordinarily be sufficiently rapidly and fairly interpreted and applied by the relatively cumbersome and dilatory judicial machinery to serve the cause of industrial peace.

So many doubts are stirred that a court would do well to move warily. Recalling with what a jaundiced eye § 301 of the Labor Management Act has been viewed by some justices of the Supreme Court in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 488, 99 L. Ed. 510, and with what difficulty the courts in this circuit were led to the doctrine of Textile Workers Union v. American Thread Co., D.C.Mass., 113 F.Supp. 137, this Court deems it undesirable to jump into what may be a bottomless pit of dispute over future working conditions. Perhaps on reflection, no one would be happy to have judges again exercising quasi-legislative magistracy over labor problems of uncertain dimension.

In any event, if the Courts are to go into the field of quasi-legislative labor awards let the representatives of the workers, the representatives of the employers, and above all the representatives of the people make themselves first heard in the halls of Congress. It would be unsound for a judge to rely upon the haphazard chances of litigation where counsel represent discrete parties not general partisan interests, and where the judge, not being informed of the legislative will, may tend arbitrarily to overaccentuate his particular parochial experience.

■ Hence assuming the constitutionality of a statute which would authorize Federal Courts to enforce legislative awards of arbitrators, I nonetheless conclude that the present United

States arbitration statute does not seek to reach that constitutional limit, but is concerned only with the enforcement of quasi-judicial awards directed at the ascertainment of facts in a past controversy and at the prescription of recoverable damages or other suitable awards for that which has been broken not for that which is to be built.

Defendant's motion to dismiss granted.

Plaintiff's motion for summary judgment denied.