PUERTO RICO LABOR RELATIONS BOARD in the name and on behalf of THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ETC., Petitioner, *v.* VALENCIA BAXT EXPRESS, INC. ET AL., Defendants; THE SEAFARERS INTERNATIONAL UNION OF NORTH AMERICA, ETC., Intervener.

No. JRT-62–2. Decided October 25, 1962.

[9] Act No. 2 of October 17, 1961 contains an analogous provision to § 5 of the Act of 1917. 32 L.P.R.A. § 3123 (1961 Supp.).

*Juan B. Fernández Badillo, Solicitor General, José Orlando Grau,* and *J. F. Rodríguez Rivera* for petitioner. *Elí B. Arroyo* and *Paul Stawinski* for defendants. *Torres Peralta & Vizcarra,* and *Federico Rodríguez Pagán* for the Union.

Division composed of Mr. Justice Hernández Matos, as Chief Judge of Division, pro-tempore, Mr. Justice Santana Becerra, and Mr. Justice Blanco Lugo.

Mr. Justice Santana Becerra delivered the opinion of the Court.

The Puerto Rico Labor Relations Board represented by the Solicitor General appeared before this Court in the name and on behalf of the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, AFL-CIO (Puerto Rico Division), in this case the Union, requesting us to order Valencia Baxt Express, Inc. and Maritime Trucking, Inc., in this case the Employers, to comply with an arbitration award. Puerto Rico Labor Relations Act, No. 6 of March 7, 1946, § 9 (2) (c), 29 L.P.R.A. § 70 (2) (c).

The Board alleges that on March 17, 1961, the parties signed certain stipulation in which they bound themselves to negotiate to commence Friday, March 24, 1961. If no agreement could be reached within 15 days after commencement of negotiations, then the entire matter should be submitted to arbitration for settlement. The Secretary of Labor of the Commonwealth of Puerto Rico would designate an arbitrator. The decision of the arbitrator would be made within 30 days after such submission and would be final and binding on both parties.

On April 19, 1961, the Secretary of Labor wrote a letter to Mr. Eduardo Gracia informing him that the strike between the Union and the Employers had been settled by a stipulation of March 17, 1961, signed by the representatives of the aforesaid parties; that on April 12, 1961, the President of the Union had informed him of the inability of the parties to reach an agreement and requested the designation of the arbitrator and that pursuant to said stipulation he designated him as such arbitrator and included a copy thereof for whatever action he deemed pertinent. After the proper procedure, on August 10, 1961, the arbitrator issued

the arbitration award. Because of the nature of the issues raised by the employers in this case, we copy below those parts of the award in which the arbitrator interprets the submission and his power to decide:

"FINDINGS ON THE QUESTIONS TO BE DECIDED

"Paragraphs 3, 4, and 5 of the submission agreement signed by the parties on March 17, 1961 (Exhibit I) set forth the questions and general procedure to be followed in the arbitration. Insofar as pertinent, said paragraphs read:

" '3. Negotiations to commence Friday, March 24th 1961. If agreement can not be reached within 15 days after commencement of negotiations, then the entire matter shall be submitted to arbitration for settlement. The Secretary of Labor of the Commonwealth of Puerto Rico shall designate such arbitrator.

" '4. The decision of such arbitrator shall be made within 30 days after such submission.

" '5. The decision shall be final and binding on both parties . . . '

"The stipulation to arbitrate is exceedingly general with respect to the issues involved in this arbitration. The stipulation merely indicates ' . . . . *then the entire matter shall be submitted to arbitration for settlement . . .* ' [emphasis supplied by arbitrator]. Which is the scope of the words 'the entire matter'? Which are the matters subject to this arbitration? In order to arrive at a decision on the issues of the case, we must examine the briefs of the parties and the statements of the parties regarding this same matter. *Exhibits 6, 7, 8, 14, 15, Stenographic Record of the Hearings.*

"BRIEF OF VALENCIA BAXT EXPRESS, INC.

"May 4, 1961. Exhibit 8.

"1. That the Collective Agreement signed with the Union on November 27, 1957, is still in force and does not expire until November 30, 1961.

"2. That even if the allegation of the Union that there is no agreement after December 1, 1960, were correct, the Union violated said agreement when it went on strike instead of relying on the arbitration clause of the aforesaid agreement.

"3. That the S.I.U. (the Union) ought not to appear as a party in this arbitration proceeding inasmuch as it lost the

representation of the laborers of Valencia Baxt Express. This issue concerns the Labor Relations Board and, therefore, the arbitrator lacks jurisdiction in this case.

"4. Assuming that these allegations were rejected and such rejection were correct, Valencia Baxt Express is in no financial condition to absorb a salary increase and the cost of other financial covenants of the agreement. Furthermore, an increase in its costs would place it at a competitive disadvantage with other trucking concerns.

"BRIEF OF MARITIME TRUCKING CO., INC.

"May 4, 1960. Exhibit 7.

"1. That the Collective Agreement signed with the Union on December 30, 1957, is still in effect and expires June 3, 1961.

"2. That this arbitration proceeding is academic since the Union's certification expires June 3, 1961; and because the Union has stated that it does not wish to represent the laborers of Maritime Trucking Company.

"3. Assuming that these allegations were rejected, and my rejection were correct, Maritime Trucking Co., Inc., is in no financial condition to absorb a salary increase and the cost of other financial covenants of the agreement. Moreover, an increase in its costs would place it at a competitive disadvantage with other trucking concerns.

"BRIEF OF THE UNION

"May 5, 1961. Exhibit 15.

"1. That the Union signed a Collective Agreement with Valencia Baxt Express on November 27, 1957, and with Maritime Trucking Company on January 9, 1958, and that both agreements expired on November 30, 1960.

"2. That the Union and the two Employers negotiated for a new agreement and the negotiations resulted in a strike that ended with the arbitration stipulation of March 17, 1961.

"3. That the Employers denied the Union's request to examine the books of both concerns in order to obtain pertinent information of a financial nature to submit it to the arbitrator.

" . . . . . . . .

"With respect to the merits of the case, the arbitrator considers that the only question submitted to him for decision is the question regarding the collective agreements among the parties and the specific questions in connection with these agreements that resulted in the submission agreement of March

17, 1961. The arbitrator deems that the issues to be decided are the following:

"1. Whether the Collective Agreement signed between the Union and Valencia Baxt Express on November 27, 1957, is still in effect or expired on November 30, 1960.

"2. Whether the Collective Agreement signed between the Union and Maritime Trucking Company on December 30, 1957, is still in effect or expired on November 30, 1960.

"3. Had there been an automatic renewal of these two agreements dated November 30, 1960, the arbitration would involve the financial covenants of the former agreement.

"4. Had these two agreements expired on November 30, it is incumbent on the arbitrator to decide the new agreement binding the parties, including, among other things:

"(a) Format and language, and duration of the new agreement with Valencia Baxt Express, Inc.

"(b) Format and language, and duration of the new agreement with Maritime Trucking Company.

"(c) Deciding as to the proposed changes in the financial covenants and conditions of work, applicable to both agreements.

"(d) Retroactive date of the financial covenants applicable to both agreements." [1]

The arbitrator decided that the collective agreements existing between the Union and the Employers had expired November 30, 1960; that since the Union timely notified its desire to continue negotiations, there was no automatic renewal of said agreements on December 1, 1960; that since said agreements expired, a new agreement should be executed to govern the relations between the Union and each Employer for a two-year term beginning December 1, 1960, and he interpreted the submission to the effect of having authority

---

[1] In addition to the text copied above the arbitrator stated that during the proceedings a group of workers of these Employers informed the Department of Labor that they objected to the arbitration proceedings and challenged the representation of the Union. In subsequent hearings the Employers objected to the arbitration proceeding due to the protests and objections of a group of laborers of their enterprises against said arbitration, against the arbitrator and against the Union. They also requested the suspension of the proceedings and that the arbitrator be disqualified under the charge of bias and prejudice. Apparently a problem of representation was being raised in which part of the workmen rejected

to draw up a new agreement.[2] Because of the importance that it has in connection with the issues raised, we attach a literal transcript of that part of the award as Appendix A of this opinion.

 On February 14, 1962, we granted 10 days to the Employers to show cause, if any, why the award should not be enforced.[3] On February 20, they filed a notice that they had requested a change of venue to the United States District Court for Puerto Rico, which was finally denied by said Court on July 10, 1962. The Employers have appeared and request the dismissal of the appeal on the ground that it is a quasi-legislative arbitration award and since the substantive federal law should prevail, it should not be enforced by this Court.

 Irrespective of the contention of the Employers, it is very questionable whether that part of the award which consists of a collective agreement to govern the relations between the parties should be enforced, inasmuch as the power of the arbitrator under the submission is doubtful to that effect.[4]

the Union, but the arbitrator did not pass on this problem on the ground that it rested with the Labor Relations Board.

[2] The award orders the Union and the Employers to appear to provide for such matters as: Union recognition, Union shop, selection of new personnel, probationary period, workday and workweek, holidays, arbitration, first step, second step, third step, check-off, vacations and sick leave, welfare fund, seniority, general provisions, minimum compensation, wages, strikes and workouts, retroactivity of wages and effectiveness.

[3] The Union appeared separately represented by attorneys Misses Torres Peralta and Vizcarra who requested leave to intervene. In this suit such intervention does not lie. Section 9(2)(c) Act No. 6 of March 7, 1946. In the absence of any objection, § 10, we granted the ladies attorneys the legal representation sought together with the Solicitor General.

[4] Act No. 376 of May 8, 1951, authorizes and regulates the commercial arbitration and expressly provided that it does not apply to arbitration agreements between employers and employees, which would continue to be governed by the Labor Relations Act under and by virtue of any other act which might be enacted to regulate the arbitration of labor-management problems. The Labor Relations Act does not regulate labor arbitration and there is no other specific legislation to that effect. However, this Court has been applying to the labor-management arbitration problems

■ In *Rios* v. *Puerto Rico Cement Corp.*, 66 P.R.R. 446, we said at p. 453, that as a general rule an award may be challenged or set aside if there exists any defect or *"insufficiency"* in the *submission*. We ratified this in *Labor Relations Board* v. *N.Y. & P.R. S.S. Co.*, 69 P.R.R. 730, 742, and in addition we said at p. 748: "Precisely because an arbitrator's award is final and binding, the arbitrator does not, unless the parties agree thereto, determine his own jurisdiction. It is for the courts and not the arbitrator *to construe* the arbitration agreement *to determine what questions the parties agreed to submit to arbitration*. And contracts providing for arbitration will be *carefully* construed in order *not to force a party* to submit to arbitration a question which *he did not intend* to be submitted." (Citations.) And at p. 751: "As we have seen, because the parties are bound by an arbitrator's award and the courts may not review it on the merits, a *submission agreement* is interpreted *carefully* to prevent arbitration of issues not submitted to arbitration. Since the submission agreement does not clearly give the Committee authority to award back pay prior to January 9, 1948, the award may not be enforced insofar as it provides for back pay prior to that date." (Italics ours.) *

■ The submission contract in this case is the stipulation of March 17, 1961. We know that there is a strike condition, but the record does not say what were the specific demands or disputes object of the stoppage. It could perhaps be based on a difference of opinion as to whether the prior agreement was or was not in effect or whether it had been renewed or not, and also there could have existed other demands or disputes. We do not know. The arbitrator himself was perplexed in the face of the vagueness and in-

---

the general principles in the doctrine which governs the arbitration matter. *Cf. Housing Authority* v. *Superior Court*, 82 P.R.R. 333, 344.

\* One of the provisions of the award in this quasi-legislative case is the back pay of the wages.

sufficiency of the submission, posing himself several questions. The entire matter is, insofar as the record before us is concerned, a strike condition. As the arbitrator himself states, he found the complement of the submission agreement in expressions of the parties during the proceedings before him. But assuming that said expressions in the course of the proceedings cured the fundamental defect of the submission, according to the way he himself states them, the interpretative conclusion which he reached to the effect that he was authorized under the submission to draw up a whole collective agreement, binding on both parties, seems groundless and of doubtful validity, particularly when, in the absence of a clear and specific authorization, free of any doubt and vagueness, it could fail to respond, as we shall later see, to a better and more desirable practice in the field of labor-management relations.

 The Employers maintain that the federal courts do not enforce an award of a quasi-legislative nature and that we should apply the substantive federal law in this case. There is no dispute that these Employers are subject to the federal legislation on labor-management relations, Taft-Hartley. It is unquestionable that that part of the award constitutes a legislative piece of the arbitrator to regulate prospectively the relations, rights, and duties of the parties for a two-year term.

Let us turn to the federal situation. In *Boston Printing Pressmen's Union* v. *Potter Press*, 241 F.2d 787, the Court of Appeals for the First Circuit refused to enforce part of a collective agreement insofar as it would lead, if enforced, to an award of this nature, although much more limited than the one in the present case. The union and the employer had agreed in a collective agreement that if either party desired a change or alteration of any of the terms of the contract it should give notice at a certain time, otherwise the agreement would continue in effect for another year. The agreement created an arbitration committee to which

all the problems would be referred as well as the interpretation of any of its clauses or any violation of the agreement which would not be settled otherwise. It was specifically agreed that all questions regarding a new agreement to become effective at the expiration of that one which could not be settled by conciliation, would be decided by arbitration.

The union notified the employer its desire to discuss certain changes in the terms and conditions of employment. Various negotiations followed and later the union informed that three questions relating to a renewal of the agreement had not been settled by conciliation, namely, three weeks' vacation with pay, two additional holidays and a sick and accident program; and it requested the employer to submit those three matters to the arbitration committee pursuant to the collective agreement. The employer answered that the agreement did not create a valid and enforceable obligation to arbitrate the renewal terms of the agreement. The union then appealed to the federal District Court requesting an order compelling the employer to submit those questions to arbitration. The employer moved for the dismissal of the proceedings and they were dismissed.

The Court of Appeals held that the federal court had power to take cognizance of the proceedings and order the specific performance of a provision of a collective agreement binding the parties to submit to arbitration a dispute, under its own ruling in *Local 205, United Electrical, etc.* v. *General Electric*, 233 F.2d 85. This decision was affirmed by the United States Supreme Court subsequent to the judgment of *Boston Printing Pressmen's Union* in *General Electric Co.* v. *Local 205*, 353 U.S. 547. But notwithstanding the fact of recognizing power to the District Court to compel the enforcement of a collective agreement—§ 301 of the Labor Relations Act of 1947, 29 U.S.C.A. § 185 (a)—the Court of Appeals noted, however, that in that case the District Court had pointed out a radical difference from the one presented in *General Electric* in the sense that now it was sought to

obtain the specific performance of a collective agreement to submit to arbitration a new contract to govern the working conditions after the expiration of the agreement in effect, that is, quoting the District Court, that "The Court is asked to direct what may conveniently be described as a prospective or quasi-legislative arbitration establishing future labor conditions not specifically envisaged in their earlier contract." And the Court of Appeals stated, quoting again the District Court, that assuming the constitutionality of a statute in which Congress, with its eyes open, might authorize the federal courts to enforce legislative awards of arbitrators, "the present United States arbitration statute . . . is concerned only with the enforcement of quasi-judicial awards directed at the ascertainment of facts in a past controversy and at the prescription of recoverable damages or other suitable awards for that which has been broken not for that which is to be built."

In the even more documented and elaborate opinion of the District Court, 141 F. Supp. 553, Judge Wyzanski indicates that the state courts have generally considered the quasi-legislative award problems to be beyond the intended reach of a judicially enforceable arbitration statute, unless, and in any event, the Legislature spoke clearly in favor of the widest possible interpretation. Judge Wyzanski, however, did not dispose of the matter merely on the basis of the technical problem presented. Considering it as a novel question not yet decided by federal courts, and envisaging the effect it might have on the delicate area of labor relations, he further said: "Indeed this Court has no information as to whether it is common in labor contracts to have such quasi-legislative provisions; nor, if it is common, whether their enforcement by courts would be desired generally . . . So many doubts are stirred that a court would do well to move warily . . . this court deems it undesirable to jump into what may be a bottomless pit of dispute over future working conditions. In any event, if the Courts are to go into the

field of quasi-legislative labor awards let the representatives of the workers, the representatives of the employers, and above all the representatives of the people make themselves first heard in the halls of Congress." Notwithstanding the public policies involved, the Supreme Court refused to review these decisions. 355 U.S. 817. Up to this moment, this is the applicable law in the federal ambit.

It is well to note that although the two decisions of *Potter Press* tie to the problem the United States Arbitration Act, 9 U.S.C., and in part rely on said statute, upon affirming the decision of Local 205 under the authority of the case of *Textile Workers Union of America* v. *Lincoln Mills of Alabama*, 353 U.S. 448, the Supreme Court did not follow the opinion of the First Circuit to the effect that the Arbitration Act provided the cause of action to compel to arbitrate, but that said cause of action arose from § 301(a) of the Taft-Hartley Act. In effect, after the decision of Lincoln Mills, the United States Arbitration Act ceased to have importance in the problem involved.[5]

When in *Lincoln Mills* the Supreme Court finally decided the differences of opinion as to whether § 301(a) of the Taft-Hartley Act merely granted jurisdiction to federal courts in disputes which involved labor organizations or whether, on the contrary, said section was source of substantive law, the

---

[5] In a proceeding filed by the Employers in September 1961, in the United States District Court to set aside this quasi-legislative arbitral award, to which the Union objected, Clemente Ruiz Nazario stated that had the Union requested in that Court the enforcement of said award against the employer, the Court would have felt compelled to dismiss the case for lack of jurisdiction either under § 301 of the Labor-Management Relations Act or under the United States Arbitration Act, by virtue of the ruling of the First Circuit in *Potter Press;* and that the lack of jurisdiction of the Court under the aforesaid case to enforce said quasi-legislative award at the request of the Union, prevented it from setting it aside at the request of the employers, 199 F. Supp. 103. By the same token the United States District Court refused subsequently the change of venue of the case in which it is sought to enforce the award. *Cf. District 50, United Mine Workers* v. *Revere Copper and Brass, Inc.*, 204 F. Supp. 349, 352.

Supreme Court holding that it was such source and that under its authority the federal courts could order the specific performance of a collective agreement which bound the parties to submit to arbitration and passing on the question of which substantive law should be applied, the Supreme Court held that it was the federal substantive law which the courts could fashion from the policy of the national labor laws. Also that the interpretation of the federal law by federal courts would prevail, not the local law. However, local law could be applied if compatible with the purposes of § 301, in order to find a remedy that will best effectuate the federal policy. Whatever state law might be applied, nevertheless, it would be absorbed as a federal law and would not constitute an independent source of private law.

 The Union maintains, invoking *Dowd Box Co.* v. *Courtney*, 368 U.S. 502, and *Teamsters Local* v. *Lucas Flour Co.*, 369 U.S. 95, that we have jurisdiction to take cognizance of this case. There is not the slightest doubt that we have jurisdiction to decide this case. *Dowd* is a modality of *Lincoln Mills*. It fundamentally decides that § 301(a) of the Labor Management Relations Act of 1947 does not grant federal courts exclusive jurisdiction to decide violations of contracts between employers and employees. That decision does not grant us any additional authority that we already did not have as we analyzed the situation in the case of N.Y. & P.R. SS. Co., and it constitutes a full ratification of what we said there.[6]

 On the other hand, we do not quite confront the situation of the case of Lucas Flour Co. (at pp. 102 to 104) nor of *Atkinson* v. *Sinclair Refining Co.*, 370 U.S. 238, inasmuch as here there is no open conflict of the local law and

---

[6] Although under § 8 of the Labor Relations Act to violate the terms of a collective agreement including a clause to accept an arbitral award, *whether or not said award is included in the terms of a collective agreement*, constitutes an unfair labor practice, which is not such under federal legislation, the Board here did not treat the matter as an unfair practice but instead it directly invoked the judicial power to impose the award.

the federal law to be decided. We have no local provision which expressly orders—or prohibits—that awards of this nature be enforced by this Court.

In the absence of a statute in our legislation that expressly compels us to enforce a quasi-legislative arbitral award, if we must choose between two policies, in the case of employers covered by federal legislation, it is logical and convenient, for the sake of the desirable uniformity in the standards that must govern labor-management problems of entities covered by said legislation, that we choose to apply the substantive federal law on the matter, which has rejected judicial action to enforce an arbitration collective agreement insofar as it would lead to a prospective award of a quasi-legislative nature or to enforce said award if it had been rendered. *Cf. Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.*, 271 F.2d 402 (C.A. 2) cert. granted: 362 U.S. 909, dismissed: 364 U.S. 801; *Metro Industrial Painting Corp.* v. *Terminal Construction Co.*, 287 F.2d 382, 385 (C.A. 2); *El Hoss Engineer & Transport Co.* v. *American Ind. Oil Co.*, 289 F.2d 346 (C.A. 2), n. 1.

There are serious considerations of public policy in this field of labor relations which would make us think carefully over the convenience of judicially enforcing an award of this nature. One of the questions to be answered is whether such a procedure would not be an indirect attempt of the Judicial Power to legislate instead of to decide judicial or quasi-judicial controversies. On the other hand, in view of the nature of the collective agreement other inconveniences have been pointed out.[7] We are not deciding now that we shall not enforce an award of this nature in a situation covered solely by our labor local laws. We repeat that there is involved a serious question of public policy and it would be preferable for the Legislature, rather than the Court,

---

[7] See this problem briefly and summarily stated in *Federal Enforcement of Agreements to Arbitrate New Contract Terms, Quasi-Legislative v. Quasi-Judicial Arbitration*, 52 Northwestern University L. R. 284–94.

to make the decision of what may be deemed most advisable.

Pursuant to all the preceding considerations the award will be enforced as to that part which declared (1) that the collective agreement between the Union and the Employers expired November 30, 1960; (2) that the Union timely notified the Employers of its desire to enter into negotiations and that this notice precluded the automatic renewal on December 1, 1960, of the existing agreements. Applying to these Employers the federal law, coupled with the serious doubt stirred as to whether the submission clause authorized or not the arbitrator to draw up himself, binding on both parties, all the clauses of a new collective agreement, the Court will not enforce that part of the award that consists in said new collective agreement. (Appendix A.)

## APPENDIX "A"

ANNEX A—AWARD ISSUED BY ARBITER
EDUARDO GRACIA
August 10, 1961

*COLLECTIVE BARGAINING AGREEMENT BETWEEN*
VALENCIA BAXT EXPRESS, INC.

AND

SEAFARERS INTERNATIONAL UNION OF NORTH
AMERICA, ATLANTIC, GULF, LAKES AND
INLAND WATERS DISTRICT, AFL-CIO
(PUERTO RICO DIVISION)

*COLLECTIVE BARGAINING AGREEMENT BETWEEN*
MARITIME TRUCKING COMPANY, INC.

AND

SEAFARERS INTERNATIONAL UNION OF NORTH
AMERICA, ATLANTIC, GULF, LAKES AND
INLAND WATERS DISTRICT, AFL-CIO
(PUERTO RICO DIVISION)

WITNESSETH

ON ONE SIDE: .................... represented by a duly authorized member of the Company, who for the purposes

of this agreement will be designated as the "Company" and

ON THE OTHER SIDE: THE SEAFARERS INTER-NATIONAL UNION OF NORTH AMERICA, represented by its officers duly authorized, who for the purposes of this contract will be designated as the "Union".

### AND DECLARE

That both parties agree at present to preserve the good relations between employer and workers, by contracting as they hereby do under the following terms and conditions:

## Article I
### UNION RECOGNITION

The Company recognizes the Seafarers International Union of North America as a *bona fide* labor organization and accepts said Union as the exclusive representative of the chauffeurs, helpers and mechanics of the Company in the Island of Puerto Rico, specifically excluding office employees, executives, foremen, supervisors and cargo clerks, to bargain collectively in relation to scale of wages, hours of work and other conditions which may arise from the employment of said workers.

## Article II
### UNION SHOP

It shall be a condition of employment that all the employees of the Company covered by this agreement shall, on the thirty-first day after the day of execution of this agreement, become members of the Union, and shall thereafter remain as such in good standing. It shall also be a condition of employment that all employees covered by this Agreement who shall be employed on or after the date of execution of this Agreement shall, on the thirty-first day following the beginning of their employment, become members of the Union and remain in it as members in good standing.

The Company agrees to discharge, upon written request of the Union, any employee covered by this Agreement who fails to become member of the Union in the specified period, or who fails to remain in the Union as member in good standing subject to the applicable legal provisions.

## Article III
### SELECTION OF NEW PERSONNEL

A. Whenever it shall be necessary to select new personnel the Company shall notify the Union with not less than twenty-

four hours of anticipation its purpose of employing said new personnel.

B. In such case the Union will recommend said personnel to the Company and the Company shall retain the faculty to accept or reject such personnel at its entire discretion.

C. Should the Union be unable to supply the personnel, the Company then will be able to hire employees from the open market of workers.

*Probationary Period*

It is agreed that new personnel shall be considered probationary personnel for a period of 30 days, starting from the date of employment and the Company may discharge said personnel or employee for any reason during said probationary period. During this probationary period, employees shall receive the wages provided in this Agreement, but shall not enjoy the benefit of the Welfare Plan or other benefits supplied by this Agreement except as provided by law. In the event an employee on probation continues in his employment after the expiration of the probationary period, then all the benefits provided in this Agreement shall be applicable to him, retroactively, to the date of the beginning of his employment.

## Article IV
### WORK DAY AND WORK WEEK

(a) Eight (8) hours shall constitute one work day and forty (40) hours shall constitute one work week.

(b) The ninth hour in excess of eight (8) hours within a period of twenty-four consecutive hours shall be paid at a rate of two times the regular rate of pay of the employee, and the hours worked in excess of the ninth hour during a period of twenty-four consecutive hours shall be paid at a rate of one and a half times the regular wage per hour.

(c) Hours worked in excess of forty (40) hours a week shall be paid at a rate of time and a half the regular salary of the employee.

(d) All hours worked during Sundays shall be paid at a rate of two times the regular rate of pay. Whenever work is performed during the holidays specified in this Agreement, the hours worked during those days shall be paid at a rate of two times the regular rate of pay currently received by the employee.

(e) It is hereby agreed and stipulated that whenever an employee works for more than eight (8) hours during a Sunday or holiday, the double pay for overtime shall be computed on the basis of the regular wage currently received by the employee on the holiday or Sunday during which the work is performed.

(f) During any week in which work is performed on Sunday or holiday or overtime work is done during any other day, the overtime compensation paid for any of the above-mentioned concepts in addition to the regular wages shall be applied when determining the overtime compensation to be paid to the employee in excess of the forty (40) hours. [Note: This clause has not been translated literally.]

(g) The working hours of the Company shall be from 8:00 A.M. to 12:00 P.M. and from 1:00 to 5:00 P.M. The schedule of working hours may be changed provided notice is given to the employee a day before such a change is made.

(h) At 9:30 A.M. the employee may take a rest period of ten (10) minutes, and another rest period of ten (10) minutes at 3:00 P.M. without any deduction in the salary of the employees.

## Article V
### HOLIDAYS

The following days shall be holidays with pay: New Year's Day, Holy Friday, Christmas Day.

Any worker who is requested to work during any of the aforementioned holidays shall receive a compensation at a rate of two times his regular rate of pay which he is currently receiving.

## Article VI
### ARBITRATION

A. The Union shall designate a representative in every department of the Company that is included in the appropriate unit. The Union shall give written notice to the Company informing the names of the Union representatives in each Department, and whenever there is a change, the Union will promptly send a written notice to the Company.

B. If a controversy, dispute, conflict or misunderstanding should arise for any reason between the Union and the Company that involves the meaning and applicability of this Agreement, or any controversy, dispute, or conflict between the Union

and the Company over the discipline, lay off, or discharge of one or more employees, or a change in the working conditions, said matter shall be decided in a final and binding manner in the following way:

### FIRST STEP

The employee, through the Union representative, shall discuss the matter with the Head of the Department not later than three working days following the date of the incident or motive of the grievance. Within the following two working days from the day the matter is submitted to the Head of the Department, he shall submit his answer to settle the issue.

### SECOND STEP

1. If no satisfactory settlement is reached during the period above specified, the Grievance Committee, composed by two (2) representatives of the Company and two (2) representatives of the Union, shall have jurisdiction to entertain and resolve the matter.

2. Not later than three working days after the decision of the Head of the Department is known, if the Union desires to continue with the case, shall file a written complaint stating the facts of the matter before the Committee and notifying them [sic] the day and hour of the meeting.

3. Once the aforementioned complaint is filed before the Grievance Committee, the Committee shall meet and shall consider the allegations of the parties, receiving if necessary, the pertinent evidence in the case. The Committee shall consider only the facts pertinent to the case in issue. The Committee shall issue its decision within the five (5) working days (excepting Saturdays, Sundays and holidays specified in Article V of this Agreement) following the date in which the Union has filed the complaint.

### THIRD STEP

Should the Grievance Committee be unable to issue its decision within the period above specified, it shall request that the Mediation & Conciliation Bureau of the Department of Labor of Puerto Rico, designate a fifth member to act with the members of the Committee to solve the matter as soon as possible. Such Committee of five (5) members shall then have the faculty to solve the matter finally, after having heard the case in its merits.

C. The Grievance Committee shall have jurisdiction in the cases in which the Union alleges that an employee or employees have been disciplined, laid off or discharged without just cause providing, however, that in order that a Union or an employee have the right to take a case before the Grievance Committee, the aggrieved employee must have worked for the Company for at least thirty-one (31) working days.

D. The decisions of the fifth member shall be final and binding.

E. The Grievance Committee does not have jurisdiction to alter, amend or modify the provisions of this Agreement.

F. Within the following five (5) days from the date of execution of this Agreement, the parties shall appoint their representatives to the Grievance Committee and shall also appoint two substitutes for each side. Both parties have the right to change their representatives in the Committee but shall give prompt written notice of said changes to the other party.

## Article VII
### CHECK OFF

The Company shall deduct from the wages of each one of the employees covered by this Agreement who has previously filed with the Company his individual written consent with such purpose, in the way prescribed by law, the weekly union dues that such employees owe the Union in this concept as members of the Union after the date of this Agreement.

The Company shall deliver, not later than five (5) working days after the last pay period of each month, a check payable to the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Waters District, Puerto Rico Division, AFL-CIO, covering the sums thus checked off and retained, to the treasurer and other officer designated by the Union in charge of the Union fund, who offer to the Company authentic evidence of the fact that such treasurer or official has deposited the bond required by Law Number 17 of April 17, 1961, as amended.

## Article VIII
### VACATION AND SICK LEAVE

(a) Every employee shall be entitled to vacations with full salary payable at the beginning of the vacation period, this

vacation period to consist of one hundred and four (104) working hours per year. Vacations shall be granted upon request by employee, in such a manner that the normal functioning of the business is not interrupted, and to that effect the Company will establish the corresponding schedule. Vacations may be accumulated up to a maximum of two (2) years. Whenever an employee ceases as such, the Company shall pay him the total thus accumulated. If the wages have not been stipulated by the day or larger periods, the compensation for each day of vacations shall be determined by multiplying by eight (8) hours the regular straight time hourly pay at the moment the employee starts his vacation period.

(b) Every regular employee will be entitled to sick leave, the illness priorly verified by medical certificate, with pay equivalent to the salary of eight (8) hours of work, at the regular straight time rate of pay, for each day of illness up to a limit of ten (10) working days per year.

(c) In case that an accident in the course of his employment precludes the worker from continuing performing his work, the Company shall pay a salary equivalent to ten (10) working hours during the first week of the accident, so long as the State Workmen's Compensation Fund finds that such accident was in the course of his employment.

## Article IX
### WELFARE FUND

A. The Company agrees to immediately become part to this Agreement and to this Declaration of the Welfare Fund known as the Seafarers International Union, Puerto Rico Division Welfare Fund, and shall contribute from now on during the life of this Agreement, with the sum of eight and a half (8½) cents per employee per hour for each day of sick leave, holidays and vacations. For the purposes of this article, each one of the days for vacation, sick leave or holidays shall include eight (8) hours.

The Company agrees in every case to make a minimum contribution to the Welfare Plan of $2.80.

B. The Company agrees to send the check of the contribution together with a list containing the names, social security and hours worked, for each employee within the next five (5) days from the last day of each month.

C. The Welfare Fund shall be administered by four trustees, two of them appointed by the Union and two of them appointed by the Employer, and according with the applicable laws.

## Article X
### SENIORITY

In case of layoff of workers for lack of work, the layoff will be made by seniority, laying off in the first place the last workers employed, that is, in the work which is available, the Company will employ the workers with more seniority.

Once the work is again normal, and the Company needs more employees, it shall reemploy the personnel in the same order, employing in the first place those who for a longer time have been working for the Company. The right of Seniority shall be lost for the following reasons:

a. Voluntary resignation of the worker.
b. Discharge for just cause.
c. Continuous absence without Company's authorization for more than five days.
d. Layoff for lack of work at the Company for more than three consecutive months.

## Article XI
### GENERAL PROVISIONS

A. *Personal Security:* The Company shall not force any employee to use vehicles, equipment, instruments or machinery which do not offer security against risks.

B. *Prerrogatives of the Administration:* It is agreed that the operation of the business of the Company and the direction of the employees, including the preparation and promulgation of reasonable rules, to insure order and the operation of the Company, the determination of the ability of the employees, the right to hire, transfer, promote, discharge for cause, and to lay off temporarily, are prerrogatives belonging to the Company, except where the right to appeal through the arbitration proceeding in this Agreement is provided.

Any of the faculties, power or authority which the Company had before the signing of this Agreement, are retained by the Company, except those specifically limited by this Agreement.

C. So long as the Company has sufficient and available equipment, it shall not utilize the equipment of any other person.

Should the Company lease a truck or trailer without driver, then it will utilize in said truck or trailer Company personnel.

D. *Bulletin Board:* The Company shall install in the premises a Bulletin Board in which the Union may post its notices, circular letters, or reports relative to the work under this Agreement.

E. *Tools:* The Company will supply to its mechanics the tools necessary to perform their work. The employees shall sign a receipt for said tools. The mechanics shall be personally responsible for said tools, which shall always be the property of the Company. The Company agrees to establish an adequate place to keep said tools.

F. *Visits of Union officers:* The Union, through its representatives, shall have the right to visit the premises of the Company. The Company, at the request of the Union, shall supply the information and data related to the employees covered by this Agreement, so long as said visits do not interrupt the work at the Company.

G. *Legal Assistance and Expenses:* Whenever employees covered by this Agreement have to appear before the courts of justice in relation to accidents or cases under the traffic law occurred while in service, the Company shall pay the lost time at the regular straight time rate of pay, so long as the accused be exonerated; providing further, that in spite of the fact that the Court may declare the employee guilty, if the Company be convinced that there is no real guilt on the part of the employee, the Company will pay the fine imposed.

The Company shall provide bailors for employees arrested for acts related to the service and within their functions and during working hours of the same.

Whenever a driver receives a parking ticket while he is loading or unloading the truck, the Company shall pay the fines imposed to its drivers for not carrying in the trucks the equipment required by the Traffic law.

H. *Work During Holidays and Free Days:* No employee shall be disciplined for inability to do extra work during holidays or in his free day. The Company has the right to require its employees to work during all other days according to the regular schedule of the Company.

I. *Transfer with Same Salary (Upgrading):* If an employee is transferred to a position of higher salary than that which he receives in his regular employment, said employee shall

receive the pay of the higher remuneration, in the period during which he works at the job to which he was transferred.

If an employee is temporarily transferred from his regular classification to another classification, with lower pay, he shall continue receiving his regular rate of pay.

If an employee is appointed to a classification with lower pay because of lay offs, he shall received only the pay corresponding to the classification with the lower wages.

J. *Leave of Absence:* The Company upon request by any of its employees, will authorize a leave of absence for a period not to exceed thirty (30) days, so long as there is a qualified substitute available. Before the expiration of said period of thirty (30) days, the employee shall, upon written request ask for an extension of said period of leave for a period of thirty (30) additional days and the Company may grant it. If said leave without pay is granted the seniority rights of the employee shall be maintained in his favor. If he does not return to his work after the expiration of said period, excluding cases of sickness, duly notified and certified, the employee shall loose his seniority rights.

K. This Agreement during its effectiveness, shall bind the successors or assignees of the contracting parties and will be for their benefit.

L. (1) The Company agrees to keep all vehicles in good condition when the drivers start working, except in cases of major repairs when the equipment has to remain for a longer period of time in the mechanic shops.

(2) The trucks which travel through the Island shall carry a spare tire. This tire shall be with the truck upon directly leaving the garage.

M. Promotions shall be made by steps according to the years of service and efficiency of the employees.

N. The Company shall equip in the warehouse a first aid kit for any emergency because of injuries which may occur to any employee while working.

O. The Company shall provide drinking water for the employees in the warehouse of all its terminals and shall keep in a visible place of each warehouse a wall clock to keep the time with exactness.

P. For every unit there shall at least be one helper. For cases of breakage of a truck in the Island, the helper shall remain in the place until the driver informs the Company and

afterwards both of them shall remain in the truck until the instructions of the Company are complied with. Both employees shall be compensated at their regular rate of pay or that payable for additional time, as the case may be.

Q. The driver shall help his helper or helpers in the loading or unloading of the trucks or trailers. The drivers shall be equally responsible for the equipment supplied by the Company.

R. It is understood that the Union shall not bargain collectively with any other Company in which the schedules of wages or economic benefits are inferior to the ones obtained in this Agreement.

S. It shall be discretionary of the Company the number of employees to be used in trucks during the trips of delivering or picking up cargo providing that there should always be a helper in each unit. If the unit makes more than one stop to deliver or receive cargo that is not a terminal of the Company, then it shall have a helper.

## Article XII

### MINIMUM COMPENSATION

A. Every employee who has started to work in his regular shift, or who has specifically been requested to work, could not work being available, shall have the right to receive the pay equivalent to four (4) hours of work at the regular rate of pay. Such guarantee shall not be applicable in cases of fire, earthquake, storm or floods. In such case, the employee shall only receive pay for hours actually worked.

In cases in which the interruption is due to lack of electrical energy supply, the Company shall retain the employee for one hour on Company time, and if at the end of that period the cause of interruption has not been corrected, the Company shall not have to pay for time in excess of the specified hour.

B. The Company may retain the employee during the expressed four (4) hours, as waiting time to start in his job, or working in any other job.

C. The four (4) hours of minimum guarantee shall be accrued only one time in the first work shift of the employee, irrespective of whether this shift is in the morning or in the afternoon.

## Article XIII

### WAGES

The wages to be paid to the employees in the appropriate unit shall be those specified in Appendix A which is attached and is made part of this Agreement.

Such wages shall be paid in all cases retroactively, from March 17, 1961, on.

## Article XIV

### STRIKES AND WORKOUTS

A. During the effectiveness of this Agreement, the Union, its officers and agents shall not instigate, promote, sponsor, nor participate in strikes, slow downs, work stoppages, or any other interruption of production. The Union shall not be responsible under this Section when its officers, agents or delegates do not instigate, promote, sponsor or participate in any organized strike, slowdown, work stoppage or any other interruption of production.

B. In the event that such acts not authorized by the Union should occur, the Union upon notice of same, shall immediately urge and instruct its members to return to work, and within the twenty-four (24) hours after notice by the Company of such work stoppage, the Union shall send a letter to the Company stating that the action taken by the Union members was not authorized.

C. The Company shall have the right to impose disciplinary measures, to any employee who participates in acts not authorized by the Union, such as strike, slow down, work stoppage, or any other difference [sic] in production during the effectiveness of this Agreement. Such employees may raise this issue through the grievance procedure herein established.

D. No lock out shall be entered by the Company.

## Article XV

### EFFECTIVENESS

This Agreement shall be in effect on December 1st, 1960, and shall continue in effect for a period of two years from such date.

*Wages Retroactive to March 17, 1961*

A. Work during regular working hours

| | *Wage Per Hour* |
|---|---|
| Trailer Drivers | $1.30 |
| Truck Drivers | 1.23 |
| Driver Helpers | 1.05 |
| Mechanics | 1.30 |
| Mechanic Helpers | 1.20 |
| Warehouse Workers | 1.15 |

B. In case of raise in the current legal minimum wage, by federal order or state decree, the classifications affected by law, shall have a wage of five cents over the minimum legal wage, and if by virtue of law any other classifications were affected, these shall also be covered by a five-cent raise over the present wage. The wage differential between classifications shall be maintained.

C. The parties shall negotiate the wages of employees in any other classifications, in addition to those already related in Section A above.

D. Wages agreed in this Article are not applicable to drivers of vehicles used in transportation of oil and related products. If the Company should enter that field of transportation, it shall negotiate the wages of these drivers with the Union.

E. It be hereby clarified that whenever it is necessary to bargain wages again the Union and the workers retain their right to strike.

August 10, 1961.